1   SHAWN T. LEUTHOLD
    ATTORNEY AT LAW
2   1671 THE ALAMEDA, SUITE 303
    SAN JOSE, CA 95126
3   TEL: (408) 924-0132
    FAX: (408) 924-0134
4   CA STATE BAR NO. 178147

5
    Attorney for Plaintiff, Semi-Materials Co., Ltd
6

7

8

9                  UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11                      SAN JOSE DIVISION

12                                      )   Case No. 11-CV-06719   LHK
                                        )
13  SEMI-MATERIALS CO. LTD, A REPUBLIC OF  )
    KOREA CORPORATION,                  )
14                                      )   FIRST AMENDED COMPLAINT
                        Plaintiff,      )
15                                      )      -  BREACH OF CONTRACT
    v.                                  )      -  BREACH OF FIDUCIARY DUTY
16                                      )
    SUNPODS, INC., A CALIFORNIA         )
17  CORPORATION; MICHAEL GUMM AND DAN   )
    JAEGER, INDIVIDUALS; AND DOES 1-20, )
18                                      )
                        Defendants.     )
19  _____)

20

21         Plaintiff, SEMI-MATERIALS CO. LTD., brings this action against the named defendants

22  for damages under the laws of the United States of America and the State of California, as

23  hereinafter alleged:

24  \\\

25  \\\

26  _____
                                  - 1 -
27  Semi-Materials Co. Ltd. v. SunPods, Inc., et al.
    11-CV-06719 LHK
28  First Amended Complaint

1                           SUBJECT MATTER JURISDICTION AND VENUE

2                                         **Jurisdiction**

3       1.     This Court has subject matter jurisdiction over the claims in this action pursuant to

4   28 U.S.C. §1332. Plaintiff is a Republic of Korea corporation and defendants are citizens of and

5   domiciled in the State of California. The amount in controversy exceeds $75,000.

6                                              **Venue**

7       2.     Venue is proper in this Court pursuant to 28 U.S.C. §1391. The claims alleged in

8   this complaint arose in the Northern District of California, the contract was to be performed in the

9   Northern District of California, and defendants may be found and served in the Northern District

10   of California.

11                         **Parties and Personal Jurisdiction**

12       3.     Plaintiff is a Republic of Korea corporation with its principal place of business in

13   the Republic of Korea,

14       4.     Plaintiff is informed and believes and on that basis alleges that defendant

15   SUNPODS, INC. ("SunPods") is a California corporation with its principal place of business

16   located at 615 Dado Street, San Jose, CA 95131, in this district.

17       5.     Plaintiff is informed and believes and on that basis alleges that individual defendant

18   MICHAEL GUMM ("Gumm") and DAN JAEGER ("Jaeger") are the controlling shareholders of

19   defendant SunPods, Inc. and are employed and domiciled in this District.

20       6.     Defendants are engaged in business in the Northern District of California and the

21   causes of action alleged in this Complaint arose in the Northern District of California.

22       7.     Defendant DOES 1 through 20 inclusive, are sued herein under fictitious names.

23   Their true names and capacities are unknown to Plaintiff. When their true names and capacities are

24   ascertained, Plaintiff will amend this complaint by inserting their true names and capacities herein.

25   Plaintiff is informed and believes and thereon alleges that each fictitiously named defendant is

26

- 2 -

27   Semi-Materials Co. Ltd. v. SunPods, Inc., et al.
     11-CV-06719 LHK
28   First Amended Complaint

1  responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages were
2  proximately caused by such defendants.

3      8.      Plaintiff is informed and believes and thereon alleges that each of the defendants was
4  the agent of the each of the remaining defendants, and in doing the things hereinafter alleged, was in
5  the course and scope of such agency and acted with permission and consent of the other defendants.

6      9.      Plaintiff is further informed and believes and thereon alleges that the various
7  corporation defendants are and were at all times relevant herein undercapitalized, operating without
8  regard to corporate formalities and existing merely to shield their controlling owners, Gumm and
9  Jaeger, from personal liability. As a result, Plaintiff alleges that the corporate defendants are the alter
10 ego of defendants Gumm and Jaeger and the court should pierce the corporate veil and hold
11 defendants Gumm and Jaeger liable to Plaintiff to the same extent as the corporate defendants.

12

13                  **FIRST CAUSE OF ACTION – BREACH OF CONTRACT**
14                       **(Against SunPods, Jaeger and Gumm)**

15

16     10.     Plaintiff realleges and hereby incorporates by reference the allegations in
17 paragraphs 1-9, above.

18     11.     On or about March 15, 2010, Plaintiff entered into a written Series B Preferred
19 Stock Purchase Agreement with Defendant, SunPods, (the "Investment Contract," attached hereto
20 as Exhibit 1 and incorporated by reference).

21     12.     Pursuant to the Investment Contract, Plaintiff was to invest $999,998.67 in
22 exchange for 564,971 shares of Sunpod's Series B Preferred Stock.

23     13.     Plaintiff performed all of its obligations under the Investment Contract and
24 delivered $999,998.67 to Sunpods.

25     14.     Sunpods breached its material obligations under the Investment Contract as follows:

26
                                       - 3 -
27 Semi-Materials Co. Ltd. v. SunPods, Inc., et al.
   11-CV-06719 LHK
28 First Amended Complaint

a. Sunpods failed to deliver the share certificate representing Plaintiff's shares, as required under Paragraph 2.2. of the Investment Agreement.

b. On information and belief, the statement in 3.3(b)(iii) of the Investment Agreement was false as Sunpods had issued or committed to issue certain stock options.

c. On information and belief, the statement in 3.7 of the Investment Agreement was false, as the patent and intellectual property rights which should have been assigned to the company had not been fully and properly assigned.

d. On information and belief, the statement in 3.8 of the Investment agreement that "Each technical and senior managerial employee of the Company has executed a confidential information and invention assignment agreement," was false. Plaintiff believes that key senior management of SunPods had not all executed such agreements at the time of the Investment Agreement.

e. The statement in 3.10 of the Investment Agreement was materially false, as the SunPods and its management were in violation of the company's bylaws and articles and state law as follows: By failing to maintain proper corporate formalities; failing to maintain the required number of directors; failing to properly hold and document shareholder and board of directors actions; failing to provide for full disclosure and independent ratification of contracts and agreements involving board member's compensation and contracts and arrangements with those board member/executives; and by failing to disclose such mismanagement to Plaintiff.

f. The statement in 3.13 of the Investment Agreement that "The Company has all franchises, permits, licenses, and any similar authority necessary for the conduct of its business as it is now being conducted by it, the lack of which would have

- 4 -

a Material Adverse Effect..." was materially false. Upon information and belief, SunPods had failed to apply for is business license to operate in San Jose at the time of the Agreement and subsequently filed a false permit application.

g. SunPods breached its obligations in 3.17 of the Investment Agreement by failing to inform Plaintiff of the matters described in a-f, above. In addition, SunPods, Jaeger and Gumm failed to disclose additional material matters – that Jaeger and Gumm were actively operating other businesses in the solar energy field.

h. SunPods and Jaeger breached their contractual obligations by executing the "Compliance Certificate" (attached to the Investment Agreement and dated March 15, 2012) which falsely restated and affirmed the truth of the representations and warranties in the Investment Agreement and compliance with closing obligations.

i. SunPods and Jaeger further breached their contractual obligation to execute a true and accurate Compliance Statement at the time of closing (the Closing Deliverables defined in item 5.6 of the Investment Contract by failing to provide such Closing Deliverables), instead providing documents dated March 15, 2010 – a full week before the Amended Articles were actually filed with the Secretary of State of California on March 22, 2010, thus well before any closing could occur.

j. Sunpods breached its contractual obligations of the Investment Agreement by failing to provide the Certificate of Good Standing from the Franchise Tax Board and the Secretary of State of California within five days of the closing, as required by 5.6 of the Investment Agreement.

- 5 -

k. On information and belief, SunPods breached its obligations under the Investment Agreement to execute and deliver an Investors' Rights Agreement in the form shown in Exhibit C to the Investment Agreement.

l. SunPods breached its obligations under the Investors' Rights Agreement by failing to timely provide the financial information called for in Section 3 of the Investors' Rights Agreement.

15. Plaintiff was materially damaged by the breaches described above in that Plaintiff never received the value for which it contracted.

16. Foremost, Plaintiff never received the share certificates representing its ownership in SunPods.

17. Plaintiff did not receive the full value of its ownership as contemplated and as contracted for, including investment in a company in good standing because the company was not built upon a proper legal foundation and was not properly managed by executives and board of directors acting competently at the time of Plaintiff's investment, as had been represented and warranted in the Investment Contract.

18. Plaintiff did not receive the benefit of timely information which was part of the written contracts. This lack of information eventually resulted in the near-collapse of the company, management allowing it to fall into suspended status, and this litigation.

19. Plaintiffs' investment has become worthless or near-worthless, comprising damages to Plaintiff of $999,998.67.

20. Plaintiff is entitled to attorneys fees under section 7.15 of the Investment Agreement

21. As the company executives who prepared, negotiated and signed the contracts with Plaintiff on behalf of SunPods, and based upon their knowledge of the falsity of the investment document and their material participation in the breaches described above, Gumm and Jaeger should be held liable to the same extent as SunPods for the breaches described herein.

- 6 -

Semi-Materials Co. Ltd. v. SunPods, Inc., et al.
11-CV-06719 LHK
First Amended Complaint

1    22.    Wherefore, Plaintiff requests the relief described below.

2

3    **SECOND CAUSE OF ACTION – BREACH OF FIDUCIARY DUTIES**

4    **(against Gumm and Jaeger as majority shareholders)**

5    23.    Plaintiff realleges and hereby incorporates by reference the allegations in

6    paragraphs 1-21, above.

7    24.    Gumm and Jaeger were at all relevant times the directors, officers and the majority

8    shareholders of SunPods.

9    25.    As majority shareholders who are directors and officers of SunPods, Gumm and

10   Jaeger owed the company and its investors generally the duty to avoid conflicts of interest, to

11   abstain from voting on matters in which they held personal interests, to assign patents and

12   intellectual property to the corporation, to operate the company in a lawful manner, and to behave

13   without violating their fiduciary duties owed to the company and to its investors and to Plaintiff in

14   particular.

15   26.    Gumm and Jaeger owed particular duties to minority shareholder Plaintiff due to

16   Plaintiff's liquidation rights which put Plaintiff ahead of other shareholders in the event of a

17   liquidation event.

18   27.    In addition to the other acts described in this Complaint, Gumm and Jaeger failed to

19   dedicate their time and energy exclusively to SunPods and they actively engaged in the

20   management and operation of competitive or potentially competitive businesses which have taken

21   opportunities which otherwise would have been available to SunPods.

22   28.    Gumm and Jaeger failed to disclose these conflicts to the Plaintiff.

23   29.    On or about December 10, 2011, Gum and Jaeger purportedly held a board meeting

24   wherein they stated that the company owes the two of them back salary and that "The Board will

25   request before filing for bankruptcy that in lieu of the above wages, the SunPods patents and other

26

- 7 -

27   Semi-Materials Co. Ltd. v. SunPods, Inc., et al.
     11-CV-06719 LHK
28   First Amended Complaint

1  trade secrets be reassigned to the founder and investors and majority shareholder for the unpaid
2  compensation and allowed by law."

3  30. This and other comments made by Gumm and Jaeger to the Plaintiff represent
4  specific threats by Gumm and Jaeger to shut down SunPods in a manner designed to allow them to
5  take the benefit of the company's contracts, customers and intellectual property for their own
6  benefit ahead of Plaintiff.

7  31. This action by the two majority shareholders uniquely disadvantages minority
8  shareholder Plaintiff because Plaintiff is supposed to be in a contractually based preferred position,
9  over other shareholders, to benefit from the liquidation preference under the Amended and
10  Restated Articles of Incorporation (see Exhibit B to the Investment Agreement) in the event of
11  liquidation, sale or merger of the company.

12  32. Further, Gumm and Jaeger's failure to complete the issuing of Plaintiff's shares has
13  further uniquely damaged Plaintiff in that they are unable to determine at this point if their Series-
14  B Preferred Share-based preferences even exist such that they can be asserted in the event of
15  liquidation, sale or merger of SunPods.

16  33. Plaintiff believes and based thereon alleges, that by the actions described in this
17  Complaint and by other actions yet-to-be-discovered, majority shareholders Gumm and Jaeger
18  breached their fiduciary duties to the minority shareholder Plaintiff.

19  34. Wherefore, Plaintiff requests the relief described below.

20
21                                    **PRAYER FOR RELIEF**

22  Plaintiff requests the following:

23      1. Rescission of its investment and return of the Plaintiff's funds.

24      2. General damages according to proof, in excess of this court's jurisdictional
25  minimum requirements.

26
- 8 -
27  Semi-Materials Co. Ltd. v. SunPods, Inc., et al.
    11-CV-06719 LHK
28  First Amended Complaint

3.   Consequential and special damages according to proof.

4.   Prejudgment interest at the maximum legal rate as allowed by law.

5.   Reasonable attorneys' fees.

6.   Costs of suit.

7.   Other such relief as the court deems just and proper.

Date: October 1, 2012

*/s/ electronic submission*
Shawn T. Leuthold
Attorney for Plaintiff

.

- 9 -

Semi-Materials Co. Ltd. v. SunPods, Inc., et al.
11-CV-06719 LHK
First Amended Complaint

1

2

# **EXHIBIT 1**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  Semi-Materials Co. Ltd. v. SunPods, Inc., et al.
    11-CV-06719 LHK
28  First Amended Complaint

**SUNPODS, INC.**

**SERIES B PREFERRED STOCK PURCHASE AGREEMENT**

March [5], 2010

## TABLE OF CONTENTS

*Page*

SECTION 1 AUTHORIZATION, SALE AND ISSUANCE ........................................................................ 1

    1.1    Authorization ...................................................................................................................... 1
    1.2    Sale and Issuance of Shares ............................................................................................... 1

SECTION 2 CLOSING DATES AND DELIVERY .............................................................................. 1

    2.1    Closing ................................................................................................................................ 1
    2.2    Delivery .............................................................................................................................. 1

SECTION 3 REPRESENTATIONS AND WARRANTIES OF THE COMPANY ...................................... 1

    3.1    Organization, Good Standing and Qualification................................................................ 1
    3.2    Subsidiaries. The Company does not own or control, directly or indirectly, any
           interest in any corporation, partnership, limited liability company, association or
           other business entity. ......................................................................................................... 2
    3.3    Capitalization ..................................................................................................................... 2
    3.4    Authorization ..................................................................................................................... 3
    3.5    Financial Statements .......................................................................................................... 3
    3.6    Material Contracts ............................................................................................................. 3
    3.7    Intellectual Property .......................................................................................................... 3
    3.8    Proprietary Information and Invention Assignment........................................................... 4
    3.9    Title to Properties and Assets; Liens................................................................................. 4
    3.10   Compliance with Other Instruments.................................................................................. 4
    3.11   Litigation............................................................................................................................ 4
    3.12   Governmental Consent ...................................................................................................... 4
    3.13   Permits ............................................................................................................................... 4
    3.14   Offering .............................................................................................................................. 4
    3.15   Registration Rights............................................................................................................. 5
    3.16   Environmental and Safety Laws......................................................................................... 5
    3.17   Disclosure .......................................................................................................................... 5

SECTION 4 REPRESENTATIONS AND WARRANTIES OF INVESTOR .......................................... 5

    4.1    No Registration .................................................................................................................. 5
    4.2    Investment Intent................................................................................................................ 5
    4.3    Investment Experience........................................................................................................ 5
    4.4    Speculative Nature of Investment ...................................................................................... 5
    4.5    Access to Data ................................................................................................................... 6
    4.6    Residency ........................................................................................................................... 6
    4.7    Rule 144.............................................................................................................................. 6
    4.8    No Public Market ............................................................................................................... 6
    4.9    Authorization ..................................................................................................................... 7
    4.10   Brokers or Finders ............................................................................................................. 7
    4.11   Tax Advisors....................................................................................................................... 7
    4.12   Legends............................................................................................................................... 7

**TABLE OF CONTENTS**
(continued)

*Page*

**SECTION 5 CONDITIONS TO INVESTOR'S OBLIGATIONS TO CLOSE** .................................... 8

    5.1        Representations and Warranties......................................................................... 8
    5.2        Covenants............................................................................................................ 8
    5.3        Blue Sky.............................................................................................................. 8
    5.4        Restated Articles................................................................................................. 8
    5.5        Rights Agreement............................................................................................... 8
    5.6        Closing Deliverables.......................................................................................... 8

**SECTION 6 CONDITIONS TO COMPANY'S OBLIGATION TO CLOSE**............................... 8

    6.1        Representations and Warranties......................................................................... 9
    6.2        Covenants............................................................................................................ 9
    6.3        Compliance with Securities Laws ..................................................................... 9
    6.4        Restated Articles................................................................................................. 9
    6.5        Rights Agreement............................................................................................... 9

**SECTION 7 MISCELLANEOUS** ....................................................................................................... 9

    7.1        Amendment ........................................................................................................ 9
    7.2        Notices ................................................................................................................ 9
    7.3        Governing Law ................................................................................................ 10
    7.4        Expenses........................................................................................................... 10
    7.5        Survival ............................................................................................................ 10
    7.6        Successors and Assigns .................................................................................... 10
    7.7        Entire Agreement ............................................................................................. 10
    7.8        Delays or Omissions ........................................................................................ 10
    7.9        California Corporate Securities Law ............................................................... 10
    7.10      Severability ...................................................................................................... 11
    7.11      Counterparts ..................................................................................................... 11
    7.12      Telecopy Execution and Delivery.................................................................... 11
    7.13      Jurisdiction; Venue .......................................................................................... 11
    7.14      Further Assurances .......................................................................................... 11
    7.15      Attorney's Fees ................................................................................................ 11
    7.16      Jury Trial.......................................................................................................... 11

**EXHIBITS**

A   Amended and Restated Articles of Incorporation

B   Schedule of Exceptions

C   Investors' Rights Agreement

D   Compliance Certificate

E   Secretary's Certificate

## SUNPODS, INC.

### SERIES B PREFERRED STOCK PURCHASE AGREEMENT

This Series B Preferred Stock Purchase Agreement (this "*Agreement*") is dated as of March [*15*], 2010, and is between SunPods, Inc., a California corporation (the "*Company*"), and Semi-Materials Co. Ltd., a [Republic of Korea] [corporation] (the "*Investor*").

### SECTION 1

### AUTHORIZATION, SALE AND ISSUANCE

**1.1    Authorization.** The Company will, prior to the Initial Closing (as defined below), authorize (a) the sale and issuance of up to 564,971 shares (the "*Shares*") of the Company's Series B Preferred Stock, par value $0.001 per share (the "*Series B Preferred*"), having the rights, privileges, preferences and restrictions set forth in the Amended and Restated Articles of Incorporation of the Company, in substantially the form attached hereto as Exhibit A (the "*Restated Articles*") and (b) the reservation of shares of Common Stock for issuance upon conversion of the Shares (the "*Conversion Shares*").

**1.2    Sale and Issuance of Shares.** Subject to the terms and conditions of this Agreement, the Investor agrees to purchase, and the Company agrees to sell and issue to the Investor, 564,971 Shares at a cash purchase price of $1.77 per share (the "*Purchase Price*").

### SECTION 2

### CLOSING DATES AND DELIVERY

**2.1    Closing.** The purchase, sale and issuance of the Shares (the "*Closing*") shall take place at the offices of Wilson Sonsini Goodrich & Rosati, Professional Corporation, 650 Page Mill Road, Palo Alto, California 94304, at 10:00 a.m. local time on March [*15*], 2010, or such other date as the Company and the Investor shall agree.

**2.2    Delivery.** At the Closing, the Company will deliver to the Investor a certificate registered in the Investor's name representing the number of Shares that the Investor is purchasing in the Closing against payment of the Purchase Price by (a) check payable to the Company, (b) wire transfer in accordance with the Company's instructions or (c) any combination of the foregoing.

### SECTION 3

### REPRESENTATIONS AND WARRANTIES OF THE COMPANY

A Schedule of Exceptions, attached as Exhibit B (the "*Schedule of Exceptions*"), shall be delivered to the Investor in connection with the Closing. Except as set forth on the Schedule of Exceptions delivered to the Investor at the Closing, the Company hereby represents and warrants to the Investor as follows:

**3.1    Organization, Good Standing and Qualification.** The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of California. The Company has the requisite corporate power and authority to own and operate its properties and assets, to carry on its business as presently conducted, to execute and deliver this Agreement, as well as the Amended and Restated

Investors' Rights Agreement dated as of March [15], 2010, attached hereto as Exhibit C (the "*Rights Agreement*," and together with this Agreement, the "*Agreements*"), to issue and sell the Shares and the Conversion Shares and to perform its obligations pursuant to the Agreements and the Restated Articles. The Company is presently qualified to do business as a foreign corporation in each jurisdiction where the failure to be so qualified could reasonably be expected to have a material adverse effect on the Company's financial condition or business as now conducted (a "*Material Adverse Effect*").

      **3.2   Subsidiaries.** The Company does not own or control, directly or indirectly, any interest in any corporation, partnership, limited liability company, association or other business entity.

      **3.3   Capitalization.**

      (a)   Immediately prior to the Initial Closing, the authorized capital stock of the Company will consist of 20,000,000 shares of Common Stock, of which 3,790,000 shares are issued and outstanding, and 950,000 shares of Preferred Stock, 300,000 shares of which are designated Series A Preferred, of which 265,954 shares are issued and outstanding, and 650,000 shares of which are designated Series B Preferred, none of which are issued and outstanding. The Common Stock, the Series A Preferred and the Series B Preferred shall have the rights, preferences, privileges and restrictions set forth in the Restated Articles.

      (b)   The outstanding shares have been duly authorized and validly issued in compliance with applicable laws, and are fully paid and nonassessable. The Company has reserved:

      (i)   the Shares for issuance pursuant to this Agreement;

      (ii)   shares of Common Stock (as may be adjusted in accordance with the provisions of the Restated Articles) for issuance upon conversion of the Shares;

      (iii)   960,000 shares of Common Stock authorized for issuance to employees, consultants and directors pursuant to its 2009 Equity Incentive Plan, under which no options to purchase shares of the Company's Common Stock are issued and outstanding as of the date of this Agreement;

      (iv)   80,296 shares of Preferred Stock for issuance upon exercise of outstanding warrants; and

      (v)   80,296 shares of Common Stock for issuance upon conversion of the shares of Preferred Stock issued or issuable upon exercise of outstanding warrants.

      (c)   All issued and outstanding shares of the Company's Common Stock (i) have been duly authorized and validly issued and are fully paid and nonassessable, and (ii) were issued in compliance with all applicable state and federal laws concerning the issuance of securities.

      (d)   The Shares, when issued and delivered and paid for in compliance with the provisions of this Agreement, will be validly issued, fully paid and nonassessable. The Conversion Shares have been duly and validly reserved and, when issued in compliance with the provisions of this Agreement, the Restated Articles, and applicable law, will be validly issued, fully paid and nonassessable. The Shares and the Conversion Shares will be free of any liens or encumbrances, other than any liens or encumbrances created by or imposed upon the Investors; *provided, however*, that the Shares and the Conversion Shares are subject to restrictions on transfer under U.S. state and/or federal securities laws and as set forth herein and in the Rights Agreement. Except as set forth in the Rights Agreement, the Shares and the Conversion Shares are not subject to any preemptive rights or rights of first refusal.

-2-

(e)     Except for the conversion privileges of the Preferred Stock, the rights provided pursuant to the Rights Agreement or as otherwise described in this Agreement or the Schedule of Exceptions, there are no options, warrants or other rights to purchase any of the Company's authorized and unissued capital stock.

**3.4     Authorization.** All corporate action on the part of the Company and its directors, officers and shareholders necessary for the authorization, execution and delivery of the Agreements by the Company, the authorization, sale, issuance and delivery of the Shares and the Conversion Shares, and the performance of all of the Company's obligations under the Agreements has been taken or will be taken prior to the Initial Closing. The Agreements, when executed and delivered by the Company, shall constitute valid and binding obligations of the Company, enforceable in accordance with their terms, except (i) as limited by laws of general application relating to bankruptcy, insolvency and the relief of debtors, (ii) as limited by rules of law governing specific performance, injunctive relief or other equitable remedies and by general principles of equity, and (iii) to the extent the indemnification provisions contained in the Rights Agreement may further be limited by applicable laws and principles of public policy.

**3.5     Financial Statements.**

The Company was recently formed, has not yet begun significant operations, and has not prepared any financial statements.

**3.6     Material Contracts.**

Except for the agreements explicitly contemplated hereby, there are no agreements, understandings, instruments, contracts, proposed transactions, judgments, orders, writs or decrees to which the Company is a party or, to its knowledge, by which it is bound which may involve (i) obligations of, or payments to, the Company in excess of $25,000 (other than obligations of, or payments to, the Company arising from purchase or sale agreements entered into in the ordinary course of business), (ii) the license of any patent, copyright, trade secret or other proprietary right to or from the Company or (iii) the grant of rights to manufacture, produce, assemble, license, market or sell the Company's products or affect the Company's exclusive right to develop, manufacture, assemble, distribute, market or sell its products (each, a *"Material Contract"*, and collectively the *"Material Contracts"*). To the Company's knowledge, all of the material contracts, agreements and instruments to which the Company is a party are valid, binding and in full force and effect in all material respects, subject to laws of general application relating to bankruptcy, insolvency and the relief of debtors and rules of law governing specific performance, injunctive relief or other equitable remedies and to general principles of equity. Neither the Company nor, to the Company's knowledge, any other party to the Material Contracts, is in material default under any of the Material Contracts.

**3.7     Intellectual Property.** To the knowledge of the Company (without having conducted any special investigation or patent search), the Company owns or possesses, or can obtain on commercially reasonable terms, sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses (software or otherwise), information, processes and similar proprietary rights (*"Intellectual Property"*) necessary to the business of the Company as presently conducted, the lack of which could reasonably be expected to have a Material Adverse Effect. Except for agreements with its own employees or consultants, standard end-user license agreements, support/maintenance agreements and agreements entered in the ordinary course of the Company's business, there are no outstanding options, licenses or agreements relating to the Intellectual Property, and the Company is not bound by or a party to any options, licenses or agreements with respect to the Intellectual Property of any other person or entity. The Company has not received any written communication alleging that the Company has violated any of the Intellectual Property of any other person or entity.

-3-

**3.8     Proprietary Information and Invention Assignment.** Each technical and senior managerial employee of the Company has executed a confidential information and invention assignment agreement.

**3.9     Title to Properties and Assets; Liens.** The Company has good and marketable title to its properties and assets, and has good title to all its leasehold interests, in each case subject to no material mortgage, pledge, lien, lease, encumbrance or charge, other than (i) liens for current taxes not yet due and payable, (ii) liens imposed by law and incurred in the ordinary course of business for obligations not past due, (iii) liens in respect of pledges or deposits under workers' compensation laws or similar legislation, and (iv) liens, encumbrances and defects in title which do not in any case materially detract from the value of the property subject thereto or have a Material Adverse Effect, and which have not arisen otherwise than in the ordinary course of business. With respect to the property and assets it leases, the Company is in compliance with such leases in all material respects and, to its knowledge, holds a valid leasehold interest free of any liens, claims or encumbrances, subject to clauses (i)-(iv) above.

**3.10     Compliance with Other Instruments.** The Company is not in violation of any material term of its articles of incorporation or bylaws, each as amended to date, or, to the Company's knowledge, in any material respect of any term or provision of any material mortgage, indebtedness, indenture, contract, agreement, instrument, judgment, order or decree to which it is party or by which it is bound which would have a Material Adverse Effect. To the Company's knowledge, the Company is not in violation of any federal or state statute, rule or regulation applicable to the Company the violation of which would have a Material Adverse Effect. The execution and delivery of the Agreements by the Company, the performance by the Company of its obligations pursuant to the Agreements, and the issuance of the Shares and the Conversion Shares, will not result in any material violation of, or materially conflict with, or constitute a material default under, the Company's articles of incorporation or bylaws, each as amended to date, or any of its agreements, nor, to the Company's knowledge, result in the creation of any material mortgage, pledge, lien, encumbrance or charge upon any of the properties or assets of the Company.

**3.11     Litigation.** There are no actions, suits, proceedings or investigations pending against the Company or its properties (nor has the Company received written notice of any threat thereof) before any court or governmental agency. The Company is not a party or subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality.

**3.12     Governmental Consent.** No consent, approval or authorization of or designation, declaration or filing with any governmental authority on the part of the Company is required in connection with the valid execution and delivery of this Agreement, or the offer, sale or issuance of the Shares the Conversion Shares, or the consummation of any other transaction contemplated by this Agreement, except (i) filing of the Restated Articles with the office of the Secretary of State of the State of California, (ii) the filing of such notices as may be required under the Securities Act of 1933, as amended (the "*Securities Act*") and (iii) such filings as may be required under applicable state securities laws, which will be timely filed within the applicable periods therefor.

**3.13     Permits.** The Company has all franchises, permits, licenses, and any similar authority necessary for the conduct of its business as now being conducted by it, the lack of which would have a Material Adverse Effect, and believes it can obtain, without undue burden or expense, any similar authority for the conduct of its business as presently planned to be conducted. The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

**3.14     Offering.** Subject to the accuracy of the Investor's representations and warranties in Section 4, the offer, sale and issuance of the Shares to be issued in conformity with the terms of this

-4-

Agreement and the issuance of the Conversion Shares, constitute transactions exempt from the registration requirements of Section 5 of the Securities Act and from the registration or qualification requirements of applicable state securities laws, and neither the Company nor any authorized agent acting on its behalf will take any action hereafter that would cause the loss of such exemption.

      **3.15**    **Registration Rights.** Except as set forth in the Rights Agreement, the Company is presently not under any obligation and has not granted any rights to register under the Securities Act any of its presently outstanding securities or any of its securities that may hereafter be issued.

      **3.16**    **Environmental and Safety Laws.** To its knowledge, the Company is not in violation of any applicable statute, law, or regulation relating to the environment or occupational health and safety, and to its knowledge, no material expenditures are or will be required in order to comply with any such existing statute, law, or regulation.

      **3.17**    **Disclosure.** The Company has provided the Investor with all the information regarding the Company reasonably available to it without undue expense that the Investor has requested for deciding whether to purchase the Shares. The Company does not represent or warrant that it will achieve any financial projections provided to the Investor and represents only that such projections were prepared in good faith.

## SECTION 4

### REPRESENTATIONS AND WARRANTIES OF INVESTOR

      The Investor hereby represents and warrants to the Company as follows:

      **4.1**    **No Registration.** The Investor understands that the Shares and the Conversion Shares, have not been, and will not be, registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Investor's representations as expressed herein or otherwise made pursuant hereto.

      **4.2**    **Investment Intent.** The Investor is acquiring the Shares, and the Conversion Shares, for investment for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof, and that the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor further represents that it does not have any contract, undertaking, agreement or arrangement with any person or entity to sell, transfer or grant participation to such person or entity or to any third person or entity with respect to any of the Shares or the Conversion Shares.

      **4.3**    **Investment Experience.** The Investor has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to the Company and acknowledges that the Investor can protect its own interests. The Investor has such knowledge and experience in financial and business matters so that the Investor is capable of evaluating the merits and risks of its investment in the Company.

      **4.4**    **Speculative Nature of Investment.** The Investor understands and acknowledges that the Company has a limited financial and operating history and that an investment in the Company is highly speculative and involves substantial risks. The Investor can bear the economic risk of the Investor's investment and is able, without impairing the Investor's financial condition, to hold the Shares and the Conversion Shares for an indefinite period of time and to suffer a complete loss of the Investor's investment.

**4.5** **Access to Data.** The Investor has had an opportunity to ask questions of, and receive answers from, the officers of the Company concerning the Agreements, the exhibits and schedules attached hereto and thereto and the transactions contemplated by the Agreements, as well as the Company's business, management and financial affairs, which questions were answered to its satisfaction. The Investor believes that it has received all the information the Investor considers necessary or appropriate for deciding whether to purchase the Shares and the Conversion Shares. The Investor understands that such discussions, as well as any information issued by the Company, were intended to describe certain aspects of the Company's business and prospects, but were not necessarily a thorough or exhaustive description. The Investor acknowledges that any business plans prepared by the Company have been, and continue to be, subject to change and that any projections included in such business plans or otherwise are necessarily speculative in nature, and it can be expected that some or all of the assumptions underlying the projections will not materialize or will vary significantly from actual results. The Investor also acknowledges that it is relying solely on its own counsel and not on any statements or representations of the Company or its agents for legal advice with respect to this investment or the transactions contemplated by the Agreements.

**4.6** **Residency.** The Investor's principal place of business is 4F Lojit Bldg., 22-2 Sunae Dong, Bundang Gu, Gyeonggi-Do, Korea.

**4.7** **Rule 144.** The Investor acknowledges that the Shares and the Conversion Shares must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available. The Investor is aware of the provisions of Rule 144 promulgated under the Securities Act which permit resale of shares purchased in a private placement subject to the satisfaction of certain conditions, which may include, among other things, the availability of certain current public information about the Company; the resale occurring not less than a specified period after a party has purchased and paid for the security to be sold; the number of shares being sold during any three-month period not exceeding specified limitations; the sale being effected through a "brokers' transaction," a transaction directly with a "market maker" or a "riskless principal transaction" (as those terms are defined in the Securities Act or the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder); and the filing of a Form 144 notice, if applicable. The Investor understands that the current public information referred to above is not now available and the Company has no present plans to make such information available. The Investor acknowledges and understands that notwithstanding any obligation under the Rights Agreement, the Company may not be satisfying the current public information requirement of Rule 144 at the time the Investor wishes to sell the Shares or the Conversion Shares, and that, in such event, the Investor may be precluded from selling such securities under Rule 144, even if the other applicable requirements of Rule 144 have been satisfied. The Investor acknowledges that, in the event the applicable requirements of Rule 144 are not met, registration under the Securities Act or an exemption from registration will be required for any disposition of the Shares or the underlying Common Stock. The Investor understands that, although Rule 144 is not exclusive, the Securities and Exchange Commission has expressed its opinion that persons proposing to sell restricted securities received in a private offering other than in a registered offering or pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales and that such persons and the brokers who participate in the transactions do so at their own risk.

**4.8** **No Public Market.** The Investor understands and acknowledges that no public market now exists for any of the securities issued by the Company and that the Company has made no assurances that a public market will ever exist for the Company's securities.

**4.9    Authorization.**

(a)    The Investor has all requisite power and authority to execute and deliver the Agreements, to purchase the Shares hereunder and to carry out and perform its obligations under the terms of the Agreements. All action on the part of the Investor necessary for the authorization, execution, delivery and performance of the Agreements, and the performance of all of the Investor's obligations under the Agreements, has been taken or will be taken prior to the Closing.

(b)    The Agreements, when executed and delivered by the Investor, will constitute valid and legally binding obligations of the Investor, enforceable in accordance with their terms except: (i) to the extent that the indemnification provisions contained in the Rights Agreement may be limited by applicable law and principles of public policy, (ii) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, and (iii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies or by general principles of equity.

(c)    No consent, approval, authorization, order, filing, registration or qualification of or with any court, governmental authority or third person is required to be obtained by the Investor in connection with the execution and delivery of the Agreements by the Investor or the performance of the Investor's obligations hereunder or thereunder.

**4.10    Brokers or Finders.** The Investor has not engaged any brokers, finders or agents, and neither the Company nor any other Investor has, nor will, incur, directly or indirectly, as a result of any action taken by the Investor, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with the Agreements.

**4.11    Tax Advisors.** The Investor has reviewed with its own tax advisors the U.S. federal, state, local and foreign tax consequences of this investment and the transactions contemplated by the Agreements. With respect to such matters, the Investor relies solely on such advisors and not on any statements or representations of the Company or any of its agents, written or oral. The Investor understands that it (and not the Company) shall be responsible for its own tax liability that may arise as a result of this investment or the transactions contemplated by the Agreements.

**4.12    Legends.** The Investor understands and agrees that the certificates evidencing the Shares or the Conversion Shares, or any other securities issued in respect of the Shares or the Conversion Shares upon any stock split, stock dividend, recapitalization, merger, consolidation or similar event, shall bear the following legend (in addition to any legend required by the Rights Agreement or under applicable state securities laws):

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER SUCH ACT AND/OR APPLICABLE STATE SECURITIES LAWS, OR UNLESS THE COMPANY HAS RECEIVED AN OPINION OF COUNSEL OR OTHER EVIDENCE, REASONABLY SATISFACTORY TO THE COMPANY AND ITS COUNSEL, THAT SUCH REGISTRATION IS NOT REQUIRED."

## SECTION 5

### CONDITIONS TO INVESTOR'S OBLIGATIONS TO CLOSE

The Investor's obligation to purchase the Shares at the Closing is subject to the fulfillment on or before the Closing of each of the following conditions, unless waived by the Investor:

**5.1      Representations and Warranties.** Except as set forth in or modified by the Schedule of Exceptions, the representations and warranties made by the Company in Section 3 shall be true and correct in all material respects (disregarding any standards of materiality contained in such representations and warranties) as of the date of the Closing.

**5.2      Covenants.** The Company shall have performed or complied with all covenants, agreements and conditions contained in this Agreement to be performed or complied with by the Company on or prior to the Closing in all material respects (disregarding any standards of materiality contained in such covenants, agreements and conditions).

**5.3      Blue Sky.** The Company shall have obtained all necessary Blue Sky law permits and qualifications, or have the availability of exemptions therefrom, required by any state for the offer and sale of the Shares and the Conversion Shares.

**5.4      Restated Articles.** The Restated Articles shall have been duly authorized, executed and filed with and accepted by the Secretary of State of the State of California.

**5.5      Rights Agreement.** The Company, the Founders and the Investors (each as defined in the Rights Agreement) shall have executed and delivered the Rights Agreement.

**5.6      Closing Deliverables.** The Company shall have delivered to Investor the following:

(a)      a certificate executed by the Chief Executive Officer, President or Chief Financial Officer of the Company on behalf of the Company, in substantially the form of Exhibit D, certifying the satisfaction of the conditions to closing listed in Sections 5.1 and 5.2.

(b)      a certificate of the Secretary of State of the State of California, and a certificate from the Franchise Tax Board of the State of California, dated as of a date within five days of the date of the Closing, with respect to the good standing of the Company.

(c)      a certificate of the Company executed by the Company's Secretary, in substantially the form of Exhibit E, attaching and certifying to the truth and correctness of (1) the Restated Articles, (2) the bylaws and (3) the board and shareholder resolutions adopted in connection with the transactions contemplated by this Agreement

### SECTION 6

### CONDITIONS TO COMPANY'S OBLIGATION TO CLOSE

The Company's obligation to sell and issue the Shares at the Closing is subject to the fulfillment on or before the Closing of the following conditions, unless waived in writing by the Company:

-8-

**6.1 Representations and Warranties.** The representations and warranties made by the Investor in Section 4 shall be true and correct in all material respects (disregarding any standards of materiality contained in such representations and warranties) when made and shall be true and correct in all material respects (disregarding any standards of materiality contained in such representations and warranties) as of the date of the Closing.

**6.2 Covenants.** The Investor shall have performed or complied with all covenants, agreements and conditions contained in the Agreements to be performed or complied with by the Investor on or prior to the Closing in all material respects (disregarding any standards of materiality contained in such covenants, agreements and conditions).

**6.3 Compliance with Securities Laws.** The Company shall be satisfied that the offer and sale of the Shares and the Conversion Shares shall be qualified or exempt from registration or qualification under all applicable federal and state securities laws (including receipt by the Company of all necessary blue sky law permits and qualifications required by any state, if any).

**6.4 Restated Articles.** The Restated Articles shall have been duly authorized, executed and filed with and accepted by the Secretary of State of the State of California.

**6.5 Rights Agreement.** The Company, the Founders and the Investors (each as defined in the Rights Agreement) shall have executed and delivered the Rights Agreement.

## SECTION 7

## MISCELLANEOUS

**7.1 Amendment.** Except as expressly provided herein, neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument referencing this Agreement and signed by the Company and the Investor.

**7.2 Notices.** All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, sent by facsimile or electronic mail or otherwise delivered by hand or by messenger addressed:

(a) if to the Investor, to 4F Lojit Bldg., 22-2 Sunae Dong, Bundang Gu, Gyeonggi-Do, Korea, Attn. President; or via facsimile at [insert fax number]; or by electronic mail at [insert email address];

(b) if to any other holder of any Shares or Conversion Shares, to such address as shown in the Company's records, or, until any such holder so furnishes an address to the Company, then to the address of the last holder of such Shares or Conversion Shares for which the Company has contact information in its records; or

(c) if to the Company, to the attention of the Chief Executive Officer or Chief Financial Officer of the Company at SunPods, Inc., 1922 The Alameda, Suite 214, San Jose, CA 95126, or at such other current address as the Company shall have furnished to the Investors, with a copy (which shall not constitute notice) to Gavin McCraley, Esq., Wilson Sonsini Goodrich & Rosati, P.C., 650 Page Mill Road, Palo Alto, California 94304.

Each such notice or other communication shall for all purposes of this Agreement be treated as effective or having been given when delivered if delivered personally, or, if sent by mail, at the earlier of its

-9-

receipt or 72 hours after the same has been deposited in a regularly maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid or, if sent by facsimile, upon confirmation of facsimile transfer or, if sent by electronic mail, upon confirmation of delivery when directed to the electronic mail address set forth on the Schedule of Investors.

**7.3    Governing Law.** This Agreement shall be governed in all respects by the internal laws of the State of California as applied to agreements entered into among California residents to be performed entirely within California, without regard to principles of conflicts of law.

**7.4    Expenses.** The Company and the Investor shall each pay their own expenses in connection with the transactions contemplated by this Agreement.

**7.5    Survival.** The representations, warranties, covenants and agreements made in this Agreement shall survive any investigation made by any party hereto and the closing of the transactions contemplated hereby.

**7.6    Successors and Assigns.** This Agreement, and any and all rights, duties and obligations hereunder, shall not be assigned, transferred, delegated or sublicensed by the Investor without the prior written consent of the Company. Any attempt by the Investor without such permission to assign, transfer, delegate or sublicense any rights, duties or obligations that arise under this Agreement shall be void. Subject to the foregoing and except as otherwise provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.

**7.7    Entire Agreement.** This Agreement, including the exhibits attached hereto, constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof. No party shall be liable or bound to any other party in any manner with regard to the subjects hereof or thereof by any warranties, representations or covenants except as specifically set forth herein or therein.

**7.8    Delays or Omissions.** Except as expressly provided herein, no delay or omission to exercise any right, power or remedy accruing to any party to this Agreement upon any breach or default of any other party under this Agreement shall impair any such right, power or remedy of such non-defaulting party, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party to this Agreement, shall be cumulative and not alternative.

**7.9    California Corporate Securities Law.** THE SALE OF THE SECURITIES THAT ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102, OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON THE QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

-10-

**7.10     Severability.** If any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Agreement, and such court will replace such illegal, void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the same economic, business and other purposes of the illegal, void or unenforceable provision. The balance of this Agreement shall be enforceable in accordance with its terms.

**7.11     Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be enforceable against the parties actually executing such counterparts, and all of which together shall constitute one instrument.

**7.12     Telecopy Execution and Delivery.** A facsimile, telecopy or other reproduction of this Agreement may be executed by one or more parties hereto and delivered by such party by facsimile or any similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen. Such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any party hereto, all parties hereto agree to execute and deliver an original of this Agreement as well as any facsimile, telecopy or other reproduction hereof.

**7.13     Jurisdiction; Venue.** With respect to any disputes arising out of or related to this Agreement, the parties consent to the exclusive jurisdiction of, and venue in, the state courts in Santa Clara County in the State of California (or in the event of exclusive federal jurisdiction, the courts of the Northern District of California).

**7.14     Further Assurances.** Each party hereto agrees to execute and deliver, by the proper exercise of its corporate, limited liability company, partnership or other powers, all such other and additional instruments and documents and do all such other acts and things as may be necessary to more fully effectuate this Agreement.

**7.15     Attorney's Fees.** In the event that any suit or action is instituted to enforce any provisions in this Agreement, the prevailing party in such dispute shall be entitled to recover from the losing party such reasonable fees and expenses of attorneys and accountants, which shall include, without limitation, all fees, costs and expenses of appeals.

**7.16     Jury Trial. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING (WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATED TO THIS AGREEMENT.** If the waiver of jury trial set forth in this section is not enforceable, then any claim or cause of action arising out of or relating to this Agreement shall be settled by judicial reference pursuant to California Code of Civil Procedure Section 638 *et seq.* before a referee sitting without a jury, such referee to be mutually acceptable to the parties or, if no agreement is reached, by a referee appointed by the Presiding Judge of the California Superior Court for Santa Clara County. This paragraph shall not restrict a party from exercising remedies under the Uniform Commercial Code or from exercising pre-judgment remedies under applicable law.

*(signature page follows)*

-11-

The parties are signing this Series B Preferred Stock Purchase Agreement as of the date stated in the introductory clause.

SUNPODS, INC.
a California corporation

By: _____

Name: _Micheal Gumm_

Title: _Executive Vice President &
Chairman of the Board_

SEMI-MATERIALS CO., LTD.
a [Republic of Korea][corporation]

By: _____

Name: _Kun Park_

Title: _CEO_

Signature Page to Series B Preferred Stock Purchase Agreement

Exhibit A

**AMENDED AND RESTATED
ARTICLES OF INCORPORATION**

## AMENDED AND RESTATED

## ARTICLES OF INCORPORATION OF

## SUNPODS, INC.

Dan Jaeger and Michael Gumm certify that:

1.    They are the President and Secretary, respectively, of SunPods, Inc., a California corporation (the "**Corporation**").

2.    The Articles of Incorporation of the Corporation are hereby amended and restated in full to read in their entirety as set forth in EXHIBIT A attached hereto, which is incorporated into this certificate by reference as if fully set forth herein.

3.    These Amended and Restated Articles of Incorporation (the "**Amended and Restated Articles**") have been duly approved by the Board of Directors of the Corporation.

4.    The Amended and Restated Articles have been duly approved by the required vote of the shareholders of the Corporation entitled to vote in accordance with the Articles of Incorporation of this Corporation and Sections 902 and 903 of the California Corporations Code. The total number of shares entitled to vote with respect to the Amended and Restated Articles was 3,790,000 shares of Common Stock and 265,954 shares of Preferred Stock. The number of shares voting in favor of the Amended and Restated Articles equaled or exceeded the vote required. The percentage vote required was more than 50% of the outstanding shares of Common Stock and more than 50% of the outstanding shares of Preferred Stock.

The undersigned declare under penalty of perjury that the matters set forth in the foregoing certificate are true and correct of their own knowledge.

Date: _03-15-2010_
San Jose, California

Dan Jaeger,
President

Michael Gumm,
Chairman of the Board and Secretary

-1-

## EXHIBIT A

### ARTICLE I

The name of the Corporation is SunPods, Inc.

### ARTICLE II

The purpose of this Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated under the California Corporations Code.

### ARTICLE III

The total number of shares of stock that the Corporation shall have authority to issue is twenty million nine hundred fifty thousand (20,950,000), consisting of twenty million (20,000,000) shares of Common Stock, \$0.001 par value per share, and nine hundred fifty thousand (950,000) shares of Preferred Stock, \$0.001 par value per share. The first Series of Preferred Stock shall be designated "Series A Preferred Stock" and shall consist of three hundred thousand (300,000) shares, and the second Series of Preferred Stock shall be designated "Series B Preferred Stock" and shall consist of six hundred fifty thousand (650,000) shares.

### ARTICLE IV

The relative powers, preferences, special rights, qualifications, limitations and restrictions granted to or imposed upon the respective classes or series of shares or the holders thereof are as follows:

1.     **Definitions.** For purposes of this ARTICLE IV, the following definitions shall apply:

(a)     "**Conversion Price**" shall mean \$0.94 per share for the Series A Preferred Stock and \$1.77 per share for the Series B Preferred Stock (subject to adjustment from time to time for Recapitalizations and as otherwise set forth elsewhere herein).

(b)     "**Convertible Securities**" shall mean any evidences of indebtedness, shares or other securities convertible into or exchangeable for Common Stock.

(c)     "**Corporation**" shall mean SunPods, Inc., a California corporation.

(d)     "**Distribution**" shall mean the transfer of cash or other property without consideration whether by way of dividend or otherwise, other than dividends on Common Stock payable in Common Stock, or the purchase or redemption of shares of the Corporation by the Corporation for cash or property other than: (i) repurchases of Common Stock issued to or held by employees, officers, directors or consultants of the Corporation or its subsidiaries upon termination of their employment or services pursuant to agreements providing for the right of said repurchase, (ii) repurchases of Common Stock issued to or held by employees, officers, directors or consultants of the Corporation or its subsidiaries pursuant to rights of first refusal contained in agreements providing for such right, (iii) repurchase of capital stock of the Corporation in connection with the settlement of disputes with any shareholder, and (iv) any other repurchase or redemption of capital stock of the Corporation approved by the holders of the Common and Preferred Stock of the Corporation voting as separate classes.





-2-

(e) **"Dividend Rate"** shall mean an annual rate of $0.0564 per share for the Series A Preferred Stock and $0.1062 per share for the Series B Preferred Stock (subject to adjustment from time to time for Recapitalizations as set forth elsewhere herein).

(f) **"Liquidation Preference"** shall mean $0.94 per share for the Series A Preferred Stock and $1.77 per share for the Series B Preferred Stock (subject to adjustment from time to time for Recapitalizations as set forth elsewhere herein).

(g) **"Options"** shall mean rights, options or warrants to subscribe for, purchase or otherwise acquire Common Stock or Convertible Securities.

(h) **"Original Issue Price"** shall mean $0.94 per share for the Series A Preferred Stock and $1.77 per share for the Series B Preferred Stock (subject to adjustment from time to time for Recapitalizations as set forth elsewhere herein).

(i) **"Preferred Stock"** shall mean the Series A Preferred Stock and the Series B Preferred Stock.

(j) **"Recapitalization"** shall mean any stock dividend, stock split, combination of shares, reorganization, recapitalization, reclassification or other similar event.

2. **Dividends.**

(a) *Preferred Stock.* In any calendar year, the holders of outstanding shares of Preferred Stock shall be entitled to receive dividends, when, as and if declared by the Board of Directors, out of any assets at the time legally available therefor, at the Dividend Rate specified for such shares of Preferred Stock payable in preference and priority to any declaration or payment of any Distribution on Common Stock of the Corporation in such calendar year. No Distributions shall be made with respect to the Common Stock unless dividends on the Preferred Stock have been declared in accordance with the preferences stated herein and all declared dividends on the Preferred Stock have been paid or set aside for payment to the Preferred Stock holders. The right to receive dividends on shares of Preferred Stock shall not be cumulative, and no right to dividends shall accrue to holders of Preferred Stock by reason of the fact that dividends on said shares are not declared or paid. Payment of any dividends to the holders of Preferred Stock shall be on a *pro rata, pari passu* basis in proportion to the Dividend Rates for each series of Preferred Stock.

(b) *Common Stock.* Dividends may be paid on the Common Stock when, as and if declared by the Board of Directors, subject to the prior dividend rights of the Preferred Stock and to Section 6.

(c) *Non-Cash Distributions.* Whenever a Distribution provided for in this Section 2 shall be payable in property other than cash, the value of such Distribution shall be deemed to be the fair market value of such property as determined in good faith by the Board of Directors.

(d) *Consent to Certain Distributions.* As authorized by Section 402.5(c) of the California Corporations Code, if Section 502 or Section 503 of the California Corporations Code is applicable to a payment made by the Corporation then such applicable section or sections shall not apply if such payment is a payment made by the Corporation in connection with (i) repurchases of Common Stock issued to or held by employees, officers, directors or consultants of the Corporation or its subsidiaries upon termination of their employment or services pursuant to agreements providing for the right of said repurchase, (ii) repurchases of Common Stock issued to or held by employees, officers, directors or consultants of the Corporation or its subsidiaries pursuant to rights of first refusal contained in agreements providing for such

-3-

right, (iii) repurchases of Common Stock or Preferred Stock in connection with the settlement of disputes with any shareholder, (iv) any other repurchase or redemption of Common Stock or Preferred Stock approved by the holders of Preferred Stock of the Corporation.

(e) *Waiver of Dividends.* Any dividend preference of any series of Preferred Stock may be waived, in whole or in part, by the consent or vote of the holders of the majority of the outstanding shares of such series.

### 3. Liquidation Rights.

(a) *Liquidation Preference.* In the event of any liquidation, dissolution or winding up of the Corporation, either voluntary or involuntary, the holders of the Preferred Stock shall be entitled to receive, prior and in preference to any Distribution of any of the assets of the Corporation to the holders of the Common Stock by reason of their ownership of such stock, an amount per share for each share of Preferred Stock held by them equal to the sum of (i) the Liquidation Preference specified for such share of Preferred Stock and (ii) all declared but unpaid ~~dividends (if any) on such share of Preferred Stock, or such lesser~~ amount as may be approved by the holders of the majority of the outstanding shares of Preferred Stock. If upon the liquidation, dissolution or winding up of the Corporation, the assets of the Corporation legally available for distribution to the holders of the Preferred Stock are insufficient to permit the payment to such holders of the full amounts specified in this Section 3(a), then the entire assets of the Corporation legally available for distribution shall be distributed with equal priority and *pro rata* among the holders of the · Preferred Stock in proportion to the full amounts they would otherwise be entitled to receive pursuant to this Section 3(a).

(b) *Remaining Assets.* After the payment or setting aside for payment to the holders of Preferred Stock of the full amounts specified in Section 3(a), the entire remaining assets of the Corporation legally available for distribution shall be distributed *pro rata* to holders of the Common Stock of the Corporation in proportion to the number of shares of Common Stock held by them.

(c) *Shares not Treated as Both Preferred Stock and Common Stock in any Distribution.* Shares of Preferred Stock shall not be entitled to be converted into shares of Common Stock in order to participate in any Distribution, or series of Distributions, as shares of Common Stock, without first foregoing participation in the Distribution, or series of Distributions, as shares of Preferred Stock.

(d) *Reorganization.* For purposes of this Section 3, a liquidation, dissolution or winding up of the Corporation shall be deemed to be occasioned by, or to include, (i) the acquisition of the Corporation by another entity by means of any transaction or series of related transactions to which the Corporation is party (including, without limitation, any stock acquisition, reorganization, merger or consolidation but excluding any sale of stock for capital raising purposes) other than a transaction or series of related transactions in which the holders of the voting securities of the Corporation outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, as a result of shares in the Corporation held by such holders prior to such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Corporation or such other surviving or resulting entity (or if the Corporation or such other surviving or resulting entity is a wholly-owned subsidiary immediately following such acquisition, its parent); (ii) a sale, lease or other disposition of all or substantially all of the assets of the Corporation and its subsidiaries taken as a whole including, without limitation by means of any transaction or series of related transactions, except where such sale, lease or other disposition is to a wholly-owned subsidiary of the Corporation; or (iii) any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary.

-4-

sans

(e)     *Valuation of Non-Cash Consideration.* If any assets of the Corporation distributed to shareholders in connection with any liquidation, dissolution, or winding up of the Corporation are other than cash, then the value of such assets shall be their fair market value as determined in good faith by the Board of Directors, *except that* any publicly-traded securities to be distributed to shareholders in a liquidation, dissolution, or winding up of the Corporation shall be valued as follows:

(i)     if the securities are then traded on a national securities exchange, then the value of the securities shall be deemed to be the average of the closing prices of the securities on such exchange over the ten (10) trading day period ending five (5) trading days prior to the Distribution;

(ii)    if the securities are actively traded over-the-counter, then the value of the securities shall be deemed to be the average of the closing bid prices of the securities over the ten (10) trading day period ending five (5) trading days prior to the Distribution.

In the event of a merger or other acquisition of the Corporation by another entity, the Distribution date shall be deemed to be the date such transaction closes.

For the purposes of this subsection 3(e), "**trading day**" shall mean any day which the exchange or system on which the securities to be distributed are traded is open and "**closing prices**" or "**closing bid prices**" shall be deemed to be: (i) for securities traded primarily on the New York Stock Exchange or a NASDAQ market, the last reported trade price or sale price, as the case may be, at 4:00 p.m., New York time, on that day and (ii) for securities listed or traded on other exchanges, markets and systems, the market price as of the end of the regular hours trading period that is generally accepted as such for such exchange, market or system. If, after the date hereof, the benchmark times generally accepted in the securities industry for determining the market price of a stock as of a given trading day shall change from those set forth above, the fair market value shall be determined as of such other generally accepted benchmark times.

4.      **Conversion.** The holders of the Preferred Stock shall have conversion rights as follows:

(a)     *Right to Convert.* Each share of Preferred Stock shall be convertible, at the option of the holder thereof, at any time after the date of issuance of such share at the office of the Corporation or any transfer agent for the Preferred Stock, into that number of fully-paid, nonassessable shares of Common Stock determined by dividing the Original Issue Price for the relevant series by the Conversion Price for such series. (The number of shares of Common Stock into which each share of Preferred Stock of a series may be converted is hereinafter referred to as the "**Conversion Rate**" for each such series.) Upon any decrease or increase in the Conversion Price for any series of Preferred Stock, as described in this Section 4, the Conversion Rate for such series shall be appropriately increased or decreased.

(b)     *Automatic Conversion.* Each share of Preferred Stock shall automatically be converted into fully-paid, non-assessable shares of Common Stock at the then effective Conversion Rate for such share (i) immediately prior to the closing of a firm commitment underwritten initial public offering pursuant to an effective registration statement filed under the Securities Act of 1933, as amended (the "**Securities Act**"), covering the offer and sale of the Corporation's Common Stock, *provided* that the aggregate gross proceeds to the Corporation are not less than $30,000,000, or (ii) upon the vote or written consent of the holders of a majority of the Preferred Stock then outstanding (voting as a single class and on an as-converted basis), or, if later, the effective date for conversion specified in such requests (each of the events referred to in (i) and (ii) are referred to herein as an "**Automatic Conversion Event**").

(c)     *Mechanics of Conversion.* No fractional shares of Common Stock shall be issued upon conversion of Preferred Stock. In lieu of any fractional shares to which the holder would otherwise be entitled, the Corporation shall pay cash equal to such fraction multiplied by the then fair market value of a



-5-

share of Common Stock as determined by the Board of Directors. For such purpose, all shares of Preferred Stock held by each holder of Preferred Stock shall be aggregated, and any resulting fractional share of Common Stock shall be paid in cash. Before any holder of Preferred Stock shall be entitled to convert the same into full shares of Common Stock, and to receive certificates therefor, he shall either (A) surrender the certificate or certificates therefor, duly endorsed, at the office of the Corporation or of any transfer agent for the Preferred Stock or (B) notify the Corporation or its transfer agent that such certificates have been lost, stolen or destroyed and execute an agreement satisfactory to the Corporation to indemnify the Corporation from any loss incurred by it in connection with such certificates, and shall give written notice to the Corporation at such office that he elects to convert the same; *provided, however,* that on the date of an Automatic Conversion Event, the outstanding shares of Preferred Stock shall be converted automatically without any further action by the holders of such shares and whether or not the certificates representing such shares are surrendered to the Corporation or its transfer agent; *provided further,* however, that the Corporation shall not be obligated to issue certificates evidencing the shares of Common Stock issuable upon such Automatic Conversion Event unless either the certificates evidencing such shares of Preferred Stock are delivered to the Corporation or its transfer agent as provided above, or the holder notifies the Corporation or its transfer agent that such certificates have been lost, stolen or destroyed and executes an agreement satisfactory to the Corporation to indemnify the Corporation from any loss incurred by it in connection with such certificates. On the date of the occurrence of an Automatic Conversion Event, each holder of record of shares of Preferred Stock shall be deemed to be the holder of record of the Common Stock issuable upon such conversion, notwithstanding that the certificates representing such shares of Preferred Stock shall not have been surrendered at the office of the Corporation, that notice from the Corporation shall not have been received by any holder of record of shares of Preferred Stock, or that the certificates evidencing such shares of Common Stock shall not then be actually delivered to such holder.

The Corporation shall, as soon as practicable after such delivery, or after such agreement and indemnification, issue and deliver at such office to such holder of Preferred Stock, a certificate or certificates for the number of shares of Common Stock to which the holder shall be entitled as aforesaid and a check payable to the holder in the amount of any cash amounts payable as the result of a conversion into fractional shares of Common Stock, plus any declared and unpaid dividends on the converted Preferred Stock. Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the shares of Preferred Stock to be converted, and the person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date; *provided, however,* that if the conversion is in connection with an underwritten offer of securities registered pursuant to the Securities Act or a merger, sale, financing, or liquidation of the Corporation or other event, the conversion may, at the option of any holder tendering Preferred Stock for conversion, be conditioned upon the closing of such transaction or upon the occurrence of such event, in which case the person(s) entitled to receive the Common Stock issuable upon such conversion of the Preferred Stock shall not be deemed to have converted such Preferred Stock until immediately prior to the closing of such transaction or the occurrence of such event.

(d) *Adjustments to Conversion Price for Diluting Issues.*

(i) *Special Definition.* For purposes of this paragraph 4(d), "**Additional Shares of Common**" shall mean all shares of Common Stock issued (or, pursuant to paragraph 4(d)(iii), deemed to be issued) by the Corporation after the filing of these Amended and Restated Articles, other than issuances or deemed issuances of:

(1) shares of Common Stock upon the conversion of the Preferred Stock;

(2) shares of Common Stock and options, warrants or other rights to purchase Common Stock issued or issuable to employees, officers or directors of, or consultants or advisors to

-6-

the Corporation or any subsidiary pursuant to stock grants, restricted stock purchase agreements, option plans, purchase plans, incentive programs or similar arrangements;

(3)     shares of Common Stock upon the exercise or conversion of Options or Convertible Securities;

(4)     shares of Common Stock issued or issuable as a dividend or distribution on Preferred Stock or pursuant to any event for which adjustment is made pursuant to paragraph 4(e), 4(f) or 4(g) hereof;

(5)     shares of Common Stock issued or issuable in a registered public offering under the Securities Act;     .

(6)     shares of Common Stock issued or issuable pursuant to the acquisition of another corporation by the Corporation by merger, purchase of substantially all of the assets or other reorganization or to a joint venture agreement, *provided*, that such issuances are approved by the Board of Directors;

(7)     shares of Common Stock issued or issuable to banks, equipment or real property lessors, other financial institutions or venture lenders pursuant to a debt financing or commercial or real property leasing transaction approved by the Board of Directors;

(8)     shares of Common Stock issued or issuable in connection with any settlement of any action, suit, proceeding or litigation approved by the Board of Directors;

(9)     shares of Common Stock issued or issuable in connection with sponsored research, collaboration, technology license, development, OEM, marketing or other similar agreements or strategic partnerships approved by the Board of Directors;

(10)     shares of Common Stock issued or issuable to suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions approved by the Board of Directors;

(11)     shares that are otherwise excluded from the definition of "Additional Shares of Common" by the written consent of holders of a majority of the outstanding shares of Preferred Stock; or

(12)     shares that are otherwise excluded from the definition of "Additional Shares of Common" by the Board of Directors.

(ii)     *No Adjustment of Conversion Price.* No adjustment in the Conversion Price of a particular series of Preferred Stock shall be made in respect of the issuance of Additional Shares of Common unless the consideration per share (as determined pursuant to paragraph 4(d)(v)) for an Additional Share of Common issued or deemed to be issued by the Corporation is less than the Conversion Price in effect on the date of, and immediately prior to such issue, for such series of Preferred Stock.

(iii)     *Deemed Issue of Additional Shares of Common.* In the event the Corporation at any time or from time to time after the Original Issue Date shall issue any Options or Convertible Securities or shall fix a record date for the determination of holders of any class of securities entitled to receive any such Options or Convertible Securities, then the maximum number of shares (as set forth in the instrument relating thereto without regard to any provisions contained therein for a subsequent

-7-

adjustment of such number) of Common Stock issuable upon the exercise of such Options or, in the case of Convertible Securities, the conversion or exchange of such Convertible Securities or, in the case of Options for Convertible Securities, the exercise of such Options and the conversion or exchange of the underlying securities, shall be deemed to have been issued as of the time of such issue or, in case such a record date shall have been fixed, as of the close of business on such record date, *provided* that in any such case in which shares are deemed to be issued:

(1)        no further adjustment in the Conversion Price of any series of Preferred Stock shall be made upon the subsequent issue of Convertible Securities or shares of Common Stock in connection with the exercise of such Options or conversion or exchange of such Convertible Securities;

(2)        if such Options or Convertible Securities by their terms provide, with the passage of time or otherwise, for any change in the consideration payable to the Corporation or in the number of shares of Common Stock issuable upon the exercise, conversion or exchange thereof (other than a change pursuant to the anti-dilution provisions of such Options or Convertible Securities such as this Section 4(d) or pursuant to Recapitalization provisions of such Options or Convertible Securities such as Sections 4(e), 4(f) and 4(g) hereof), the Conversion Price of each series of Preferred Stock and any subsequent adjustments based thereon shall be recomputed to reflect such change as if such change had been in effect as of the original issue thereof (or upon the occurrence of the record date with respect thereto);

(3)        no readjustment pursuant to clause (2) above shall have the effect of increasing the Conversion Price of a series of Preferred Stock to an amount above the Conversion Price that would have resulted from any other issuances of Additional Shares of Common and any other adjustments provided for herein between the original adjustment date and such readjustment date;

(4)        upon the expiration of any such Options or any rights of conversion or exchange under such Convertible Securities which shall not have been exercised, the Conversion Price of each Series of Preferred Stock computed upon the original issue thereof (or upon the occurrence of a record date with respect thereto) and any subsequent adjustments based thereon shall, upon such expiration, be recomputed as if:

(a)        in the case of Convertible Securities or Options for Common Stock, the only Additional Shares of Common issued were the shares of Common Stock, if any, actually issued upon the exercise of such Options or the conversion or exchange of such Convertible Securities and the consideration received therefor was the consideration actually received by the Corporation for the issue of such exercised Options plus the consideration actually received by the Corporation upon such exercise or for the issue of all such Convertible Securities which were actually converted or exchanged, plus the additional consideration, if any, actually received by the Corporation upon such conversion or exchange, and

(b)        in the case of Options for Convertible Securities, only the Convertible Securities, if any, actually issued upon the exercise thereof were issued at the time of issue of such Options, and the consideration received by the Corporation for the Additional Shares of Common deemed to have been then issued was the consideration actually received by the Corporation for the issue of such exercised Options, plus the consideration deemed to have been received by the Corporation (determined pursuant to Section 4(d)(v)) upon the issue of the Convertible Securities with respect to which such Options were actually exercised; and

(5)        if such record date shall have been fixed and such Options or Convertible Securities are not issued on the date fixed therefor, the adjustment previously made in the Conversion Price which became effective on such record date shall be canceled as of the close of business on

such record date, and thereafter the Conversion Price shall be adjusted pursuant to this paragraph 4(d)(iii) as of the actual date of their issuance.

(iv)     *Adjustment of Conversion Price Upon Issuance of Additional Shares of Common.* In the event this Corporation shall issue Additional Shares of Common (including Additional Shares of Common deemed to be issued pursuant to paragraph 4(d)(iii)) without consideration or for a consideration per share less than the applicable Conversion Price of a series of Preferred Stock in effect on the date of and immediately prior to such issue, then, the Conversion Price of the affected series of Preferred Stock shall be reduced, concurrently with such issue, to a price (calculated to the nearest cent) determined by multiplying such Conversion Price by a fraction, the numerator of which shall be the number of shares of Common Stock outstanding immediately prior to such issue plus the number of shares which the aggregate consideration received by the Corporation for the total number of Additional Shares of Common so issued would purchase at such Conversion Price, and the denominator of which shall be the number of shares of Common Stock outstanding immediately prior to such issue plus the number of such Additional Shares of Common so issued. Notwithstanding the foregoing, the Conversion Price shall not be reduced at such time if the amount of such reduction would be less than $0.01, but any such amount shall be carried forward, and a reduction will be made with respect to such amount at the time of, and together with, any subsequent reduction which, together with such amount and any other amounts so carried forward, equal $0.01 or more in the aggregate. For the purposes of this Subsection 4(d)(iv), all shares of Common Stock issuable upon conversion of all outstanding shares of Preferred Stock and the exercise and/or conversion of any other outstanding Convertible Securities and all outstanding Options shall be deemed to be outstanding.

(v)     *Determination of Consideration.* For purposes of this subsection 4(d), the consideration received by the Corporation for the issue (or deemed issue) of any Additional Shares of Common shall be computed as follows:

(1)     *Cash and Property.* Such consideration shall:

(a)     insofar as it consists of cash, be computed at the aggregate amount of cash received by the Corporation before deducting any reasonable discounts, commissions or other expenses allowed, paid or incurred by the Corporation for any underwriting or otherwise in connection with such issuance;

(b)     insofar as it consists of property other than cash, be computed at the fair market value thereof at the time of such issue, as determined in good faith by the Board of Directors; and

(c)     in the event Additional Shares of Common are issued together with other shares or securities or other assets of the Corporation for consideration which covers both, be the proportion of such consideration so received, computed as provided in clauses (a) and (b) above, as reasonably determined in good faith by the Board of Directors.

(2)     *Options and Convertible Securities.* The consideration per share received by the Corporation for Additional Shares of Common deemed to have been issued pursuant to paragraph 4(d)(iii) shall be determined by dividing

(x)     the total amount, if any, received or receivable by the Corporation as consideration for the issue of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such consideration) payable to the Corporation upon the exercise of such Options or the conversion or exchange of such Convertible Securities,

-9-

or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities by

(y) the maximum number of shares of Common Stock (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or the conversion or exchange of such Convertible Securities.

(e) ***Adjustments for Subdivisions or Combinations of Common Stock.*** In the event the outstanding shares of Common Stock shall be subdivided (by stock split, by payment of a stock dividend or otherwise), into a greater number of shares of Common Stock, the Conversion Price of each series of Preferred Stock in effect immediately prior to such subdivision shall, concurrently with the effectiveness of such subdivision, be proportionately decreased. In the event the outstanding shares of Common Stock shall be combined (by reclassification or otherwise) into a lesser number of shares of Common Stock, the Conversion Prices in effect immediately prior to such combination shall, concurrently with the effectiveness of such combination, be proportionately increased.

(f) ***Adjustments for Subdivisions or Combinations of Preferred Stock.*** In the event the outstanding shares of Preferred Stock or a series of Preferred Stock shall be subdivided (by stock split, by payment of a stock dividend or otherwise), into a greater number of shares of Preferred Stock, the Dividend Rate, Original Issue Price and Liquidation Preference of the affected series of Preferred Stock in effect immediately prior to such subdivision shall, concurrently with the effectiveness of such subdivision, be proportionately decreased. In the event the outstanding shares of Preferred Stock or a series of Preferred Stock shall be combined (by reclassification or otherwise) into a lesser number of shares of Preferred Stock, the Dividend Rate, Original Issue Price and Liquidation Preference of the affected series of Preferred Stock in effect immediately prior to such combination shall, concurrently with the effectiveness of such combination, be proportionately increased.

(g) ***Adjustments for Reclassification, Exchange and Substitution.*** Subject to Section 3 ("***Liquidation Rights***"), if the Common Stock issuable upon conversion of the Preferred Stock shall be changed into the same or a different number of shares of any other class or classes of stock, whether by capital reorganization, reclassification or otherwise (other than a subdivision or combination of shares provided for above), then, in any such event, in lieu of the number of shares of Common Stock which the holders would otherwise have been entitled to receive each holder of such Preferred Stock shall have the right thereafter to convert such shares of Preferred Stock into a number of shares of such other class or classes of stock which a holder of the number of shares of Common Stock deliverable upon conversion of such series of Preferred Stock immediately before that change would have been entitled to receive in such reorganization or reclassification, all subject to further adjustment as provided herein with respect to such other shares.

(h) ***Certificate as to Adjustments.*** Upon the occurrence of each adjustment or readjustment of the Conversion Price pursuant to this Section 4, the Corporation at its expense shall promptly compute such adjustment or readjustment in accordance with the terms hereof and furnish to each holder of Preferred Stock a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The Corporation shall, upon the written request at any time of any holder of Preferred Stock, furnish or cause to be furnished to such holder a like certificate setting forth (i) such adjustments and readjustments, (ii) the Conversion Price at the time in effect and (iii) the number of shares of Common Stock and the amount, if any, of other property which at the time would be received upon the conversion of Preferred Stock.

(i) ***Waiver of Adjustment of Conversion Price.*** Notwithstanding anything herein to the contrary, any downward adjustment of the Conversion Price of any series of Preferred Stock may be waived

by the consent or vote of the holders of the majority of the outstanding shares of such series either before or after the issuance causing the adjustment.

(j)     *Notices of Record Date.* In the event that this Corporation shall propose at any time:

(i)     to declare any Distribution upon its Common Stock, whether in cash, property, stock or other securities, whether or not a regular cash dividend and whether or not out of earnings or earned surplus;

(ii)    to effect any reclassification or recapitalization of its Common Stock outstanding involving a change in the Common Stock; or

(iii)   to voluntarily liquidate or dissolve or to enter into any transaction deemed to be a liquidation, dissolution or winding up of the corporation pursuant to Section 3(d);

then, in connection with each such event, this Corporation shall send to the holders of the Preferred Stock prior written notice of the date on which a record shall be taken for such Distribution (and specifying the date on which the holders of Common Stock shall be entitled thereto and, if applicable, the amount and character of such Distribution) or for determining rights to vote in respect of the matters referred to in (ii) and (iii) above.

Such written notice shall be given by first class mail (or express courier), postage prepaid, addressed to the holders of Preferred Stock at the address for each such holder as shown on the books of the Corporation and shall be deemed given on the date such notice is mailed.

The notice provisions set forth in this section may be waived by the consent or vote of the holders of a majority of the Preferred Stock, voting as a single class and on an as-converted basis.

(k)     *Reservation of Stock Issuable Upon Conversion.* The Corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock solely for the purpose of effecting the conversion of the shares of the Preferred Stock, such number of its shares of Common Stock as shall from time to time be sufficient to effect the conversion of all then outstanding shares of the Preferred Stock; and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Preferred Stock, the Corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purpose.

5.     **Voting.**

(a)     *Restricted Class Voting.* Except as otherwise expressly provided herein or as required by law, the holders of Preferred Stock and the holders of Common Stock shall vote together and not as separate classes.

(b)     *No Series Voting.* Other than as provided herein or required by law, there shall be no series voting.

(c)     *Preferred Stock.* Each holder of Preferred Stock shall be entitled to the number of votes equal to the number of shares of Common Stock into which the shares of Preferred Stock held by such holder could be converted as of the record date. The holders of shares of the Preferred Stock shall be entitled to vote on all matters on which the Common Stock shall be entitled to vote. Holders of Preferred Stock shall be entitled to notice of any shareholders' meeting in accordance with the Bylaws of the Corporation.



-11-

Fractional votes shall not, however, be permitted and any fractional voting rights resulting from the above formula (after aggregating all shares into which shares of Preferred Stock held by each holder could be converted), shall be disregarded.

(d) **Common Stock.** Each holder of shares of Common Stock shall be entitled to one vote for each share thereof held.

6. **Amendments and Changes.** As long as 150,000 shares of Preferred Stock shall be issued and outstanding, the Corporation shall not, without first obtaining the approval (by vote or written consent as provided by law) of the holders of more than 50% of the outstanding shares of the Preferred Stock, amend, alter or repeal any provision of the Amended and Restated Articles if such action would adversely alter the rights, preferences, privileges or powers of, or restrictions provided for the benefit of the Preferred Stock or any series thereof.

7. **Notices.** Any notice required by the provisions of this 0 to be given to the holders of Preferred Stock shall be deemed given if deposited in the United States mail, postage prepaid, and addressed to each holder of record at such holder's address appearing on the books of the Corporation.

## ARTICLE V

Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

## ARTICLE VI

Unless otherwise set forth herein, the number of directors that constitute the Board of Directors of the Corporation shall be fixed by, or in the manner provided in, the Bylaws of the Corporation.

## ARTICLE VII

In furtherance and not in limitation of the powers conferred by statute, the Board of Directors of the Corporation is expressly authorized to adopt, amend or repeal the Bylaws of the Corporation.

## ARTICLE VIII

1. **Limitation of Directors' Liability.** The liability of the directors of this Corporation for monetary damages shall be eliminated to the fullest extent permissible under California law.

2. **Indemnification of Corporate Agents.** This Corporation is authorized to provide indemnification of agents (as defined in Section 317 of the California Corporations Code) through bylaw provisions, agreements with agents, votes of shareholders or disinterested directors or otherwise, in excess of the indemnification otherwise permitted by Section 317 of the California Corporations Code, subject only to the applicable limits set forth in Section 204 of the California Corporations Code with respect to actions for breach of duty to this Corporation and its shareholders.

3. **Repeal or Modification.** Any repeal or modification of the foregoing provisions of this ARTICLE VIII shall not adversely affect any right or protection of an agent of this Corporation relating to acts or omissions occurring prior to such repeal or modification.



-12-

## Exhibit B

## SCHEDULE OF EXCEPTIONS

## SCHEDULE OF EXCEPTIONS

This Schedule of Exceptions is made and given pursuant to Section 3 of the Series A Preferred Stock Purchase Agreement, dated as of May 18, 2009 (the "*Agreement*"), between SunPods, Inc., a California corporation (the "*Company*") and the Investors listed on Exhibit A thereto. All capitalized terms used but not defined herein shall have the meanings as defined in the Agreement, unless otherwise provided. The section numbers below correspond to the section numbers of the representations and warranties in the Agreement; *provided, however*, that any information disclosed herein under any section number shall be deemed to be disclosed and incorporated into any other section number under the Agreement where such disclosure would be appropriate.

Nothing in this Schedule of Exceptions is intended to broaden the scope of any representation or warranty contained in the Agreement or to create any covenant. Inclusion of any item in this Schedule of Exceptions (1) does not represent a determination that such item is material or establish a standard of materiality, (2) does not represent a determination that such item did not arise in the ordinary course of business, (3) does not represent a determination that the transactions contemplated by the Agreement require the consent of third parties, and (4) shall not constitute, or be deemed to be, an admission to any third party concerning such item.

### 3.6    Material Contracts

(i)

In connection with Dan S. Jaeger's and Michael Gumm's advancement of certain fees and costs on behalf of the Company between November 2008 and the date hereof, the Company has issued promissory notes, dated as of May 4, 2009, to each of Mr. Jaeger and Mr. Gumm, pursuant to which the Company is obligated to repay to Messrs. Jaeger and Gumm aggregate principal in the amounts of approximately $35,883 and $2,350, respectively, together with interest at a rate of 4.0% per annum, which interest shall accrue from the dates on which such individual advances were made. Payment in full shall be made over the course of 12 months in equal monthly payments of principal and interest, commencing on the one-month anniversary of the initial closing of the Company's Series A Preferred Stock financing.

Pursuant to that certain Rental Agreement, dated as of April 19, 2009, by and between the Company and Airport Properties, a joint venture, the Company is obligated to pay to Airport Properties rent in the amount of $2,750 per month for so long as the Company occupies the leased premises. Such Rental Agreement is month-to-month and may be terminated by either the Company or Airport Properties upon giving 30 days' prior written notice.

**Exhibit C**

**INVESTORS' RIGHTS AGREEMENT**

**SunPods, Inc.**

**AMENDED AND RESTATD INVESTORS' RIGHTS AGREEMENT**

**March [___], 2010**

**TABLE OF CONTENTS**

*Page*

Section 1 Definitions ...................................................................................................................... 1

    **1.1**    **Certain Definitions** ................................................................................. 1

Section 2 Registration Rights ........................................................................................................ 3

    **2.1**    **Requested Registration** ........................................................................ 3
    **2.2**    **Company Registration** ......................................................................... 5
    **2.3**    **Registration on Form S-3** ................................................................... 6
    **2.4**    **Expenses of Registration** .................................................................... 7
    **2.5**    **Registration Procedures** ..................................................................... 7
    **2.6**    **Indemnification** ................................................................................... 8
    **2.7**    **Information by Holder** ...................................................................... 10
    **2.8**    **Restrictions on Transfer** .................................................................. 10
    **2.9**    **Rule 144 Reporting** .......................................................................... 12
    **2.10**    **Market Stand-Off Agreement** ......................................................... 12
    **2.11**    **Delay of Registration** ....................................................................... 12
    **2.12**    **Transfer or Assignment of Registration Rights** ............................. 12
    **2.13**    **Limitations on Subsequent Registration Rights** ............................. 13
    **2.14**    **Termination of Registration Rights** ................................................ 13

Section 3 Information Covenants of the Company ....................................................................... 13

    **3.1**    **Basic Financial Information and Inspection Rights** ........................ 13
    **3.2**    **Confidentiality** .................................................................................. 14
    **3.3**    **Termination of Covenants** ................................................................ 14

Section 4 Right of First Refusal ................................................................................................... 14

    **4.1**    **Right of First Refusal to Significant Holders** ................................. 14

Section 5 Miscellaneous ............................................................................................................... 15

    **5.1**    **Amendment** ....................................................................................... 15
    **5.2**    **Notices** .............................................................................................. 16
    **5.3**    **Governing Law** ................................................................................. 16
    **5.4**    **Successors and Assigns** .................................................................... 16
    **5.5**    **Entire Agreement** ............................................................................. 16
    **5.6**    **Delays or Omissions** ........................................................................ 17
    **5.7**    **Severability** ...................................................................................... 17
    **5.8**    **Titles and Subtitles** ......................................................................... 17
    **5.9**    **Counterparts** ..................................................................................... 17
    **5.10**    **Telecopy Execution and Delivery** ................................................... 17
    **5.11**    **Jurisdiction; Venue** .......................................................................... 17
    **5.12**    **Further Assurances** .......................................................................... 17
    **5.13**    **Termination Upon Change of Control** ............................................ 18
    **5.14**    **Conflict** ............................................................................................. 18
    **5.15**    **Attorneys' Fees** ................................................................................ 18
    **5.16**    **Aggregation of Stock** ...................................................................... 18
    **5.17**    **Jury Trial** ......................................................................................... 18

## SUNPODS, INC.

## AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT

This Amended and Restated Investors' Rights Agreement (this "*Agreement*") is dated as of March [__], 2010, and is between SunPods, Inc., a California corporation (the "*Company*"), and the persons and entities listed on Exhibit A (each, an "*Investor*" and collectively, the "*Investors*").

## RECITALS

**WHEREAS,** certain of the Investors are parties to that certain Series B Preferred Stock Purchase Agreement of even date herewith (the "*Purchase Agreement*"), and it is a condition to the closing of the sale of the Series B Preferred Stock thereunder that the Investors and the Company execute and deliver this Agreement.

**WHEREAS,** certain of the Investors (the "*Prior Investors*") own outstanding shares of the Company's Series A Preferred Stock and are parties to the Investors' Rights Agreement dated as of May 18, 2009 (the "*Prior Agreement*"), and it is a condition to closing of the sale of the Series B Preferred Stock that, pursuant to the requirements of Section 5.1 of the Prior Agreement, the requisite parties to the Prior Agreement amend and restate the Prior Agreement by entering into this Agreement.

**WHEREAS,** the undersigned Prior Investors desire to amend and restate in its entirety the Prior Agreement and to accept the rights and obligations created pursuant hereto in lieu of their rights and obligations under the Prior Agreement.

**WHEREAS,** this amendment and restatement of the Prior Agreement shall become effective, pursuant to the requirements of Section 5.1 of the Prior Agreement, upon the execution by the Company and the Prior Investors holding a majority of the Registrable Securities, as defined in the Prior Agreement.

**NOW, THEREFORE:** In consideration of the mutual promises and covenants set forth herein, the parties hereto agree as follows:

## SECTION 1

## DEFINITIONS

**1.1** **Certain Definitions.** As used in this Agreement, the following terms shall have the meanings set forth below:

(a) "*Commission*" shall mean the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act.

(b) "*Common Stock*" means the Common Stock of the Company.

(c) "*Conversion Stock*" shall mean shares of Common Stock issued upon conversion of the Series A Preferred Stock and Series B Preferred Stock.

(d)     *"Exchange Act"* shall mean the Securities Exchange Act of 1934, as amended, or any similar successor federal statute and the rules and regulations thereunder, all as the same shall be in effect from time to time.

(e)     *"Holder"* shall mean any Investor who holds Registrable Securities and any holder of Registrable Securities to whom the registration rights conferred by this Agreement have been duly and validly transferred in accordance with Section 2.12 of this Agreement.

(f)     *"Indemnified Party"* shall have the meaning set forth in Section 2.6(c).

(g)     *"Indemnifying Party"* shall have the meaning set forth in Section 2.6(c).

(h)     *"Initial Closing"* shall mean the date of the initial sale of shares of the Company's Series B Preferred Stock pursuant to the Purchase Agreement.

(i)     *"Initial Public Offering"* shall mean the closing of the Company's first firm commitment underwritten public offering of the Company's Common Stock registered under the Securities Act.

(j)     *"Initiating Holders"* shall mean any Holder or Holders who in the aggregate hold not less than fifty percent (50%) of the outstanding Registrable Securities.

(k)     *"Investors"* shall mean the persons and entities listed on Exhibit A hereto.

(l)     *"New Securities"* shall have the meaning set forth in Section **Error! Reference source not found.**.

(m)     *"Purchase Agreement"* shall have the meaning set forth in the Recitals.

(n)     *"Registrable Securities"* shall mean (i) shares of Common Stock issued or issuable pursuant to the conversion of the Shares and (ii) any Common Stock issued as a dividend or other distribution with respect to or in exchange for or in replacement of the shares referenced in (i) above; *provided, however,* that Registrable Securities shall not include any shares of Common Stock described in clause (i) or (ii) above which have previously been registered or which have been sold to the public either pursuant to a registration statement or Rule 144, or which have been sold in a private transaction in which the transferor's rights under this Agreement are not validly assigned in accordance with this Agreement.

(o)     The terms *"register," "registered"* and *"registration"* shall refer to a registration affected by preparing and filing a registration statement in compliance with the Securities Act and applicable rules and regulations thereunder, and the declaration or ordering of the effectiveness of such registration statement.

(p)     *"Registration Expenses"* shall mean all expenses incurred in effecting any registration pursuant to this Agreement, including, without limitation, all registration, qualification, and filing fees, printing expenses, escrow fees, fees and disbursements of counsel for the Company, blue sky fees and expenses, and expenses of any regular or special audits incident to or required by any such registration, but shall not include Selling Expenses, fees and disbursements of counsel for the Holders and the compensation of regular employees of the Company, which shall be paid in any event by the Company.

-2-

(q)    *"Restricted Securities"* shall mean any Registrable Securities required to bear the first legend set forth in Section 2.8(c).

(r)    *"Rule 144"* shall mean Rule 144 as promulgated by the Commission under the Securities Act, as such Rule may be amended from time to time, or any similar successor rule that may be promulgated by the Commission.

(s)    *"Rule 145"* shall mean Rule 145 as promulgated by the Commission under the Securities Act, as such Rule may be amended from time to time, or any similar successor rule that may be promulgated by the Commission

(t)    *"Rule 415"* shall mean Rule 415 as promulgated by the Commission under the Securities Act, as such Rule may be amended from time to time, or any similar successor rule that may be promulgated by the Commission.

(u)    *"Securities Act"* shall mean the Securities Act of 1933, as amended, or any similar successor federal statute and the rules and regulations thereunder, all as the same shall be in effect from time to time.

(v)    *"Selling Expenses"* shall mean all underwriting discounts, selling commissions and stock transfer taxes applicable to the sale of Registrable Securities and fees and disbursements of counsel for any Holder.

(w)    *"Series A Preferred Stock"* shall mean the Company's Series A Preferred Stock.

(x)    *"Series B Preferred Stock"* shall mean the shares of the Company's Series B Preferred Stock issued pursuant to the Purchase Agreement.

(y)    *"Shares"* shall mean the Company's Series A Preferred Stock and Series B Preferred Stock.

(z)    *"Withdrawn Registration"* shall mean a forfeited demand registration under Section 2.1 in accordance with the terms and conditions of Section 2.4.

## SECTION 2

### REGISTRATION RIGHTS

**2.1    Requested Registration.**

(a)    *Request for Registration.* Subject to the conditions set forth in this Section 2.1, if the Company shall receive from Initiating Holders a written request signed by such Initiating Holders that the Company effect any registration with respect to all or a part of the Registrable Securities (such request shall state the number of shares of Registrable Securities to be disposed of by such Initiating Holders), the Company will:

(i)    promptly give written notice of the proposed registration to all other Holders; and

-3-

(ii) as soon as practicable, file and use its commercially reasonable efforts to effect such registration (including, without limitation, filing post-effective amendments, appropriate qualifications under applicable blue sky or other state securities laws, and appropriate compliance with the Securities Act) and to permit or facilitate the sale and distribution of all or such portion of such Registrable Securities as are specified in such request, together with all or such portion of the Registrable Securities of any Holder or Holders joining in such request as are specified in a written request received by the Company within twenty (20) days after such written notice from the Company is mailed or delivered.

(b) **Limitations on Requested Registration.** The Company shall not be obligated to effect, or to take any action to effect, any such registration pursuant to this Section 2.1:

(i) Prior to the earlier of (A) the five (5) year anniversary of the date of this Agreement or (B) one hundred eighty (180) days following the effective date of the first registration statement filed by the Company covering an underwritten offering of any of its securities to the general public (or the subsequent date on which all market stand-off agreements applicable to the offering have terminated);

(ii) If the Initiating Holders, together with the holders of any other securities of the Company entitled to inclusion in such registration statement, propose to sell Registrable Securities and such other securities (if any) the aggregate proceeds of which (after deduction for underwriter's discounts and expenses related to the issuance) are less than $30,000,000;

(iii) In any particular jurisdiction in which the Company would be required to execute a general consent to service of process in effecting such registration, qualification, or compliance, unless the Company is already subject to service in such jurisdiction and except as may be required by the Securities Act;

(iv) After the Company has initiated two such registrations pursuant to this Section 2.1;

(v) During the period starting with the date sixty (60) days prior to the Company's good faith estimate of the date of filing of, and ending on a date one hundred eighty (180) days after the effective date of, a Company-initiated registration (or ending on the subsequent date on which all market stand-off agreements applicable to the offering have terminated); *provided* that the Company is actively employing in good faith commercially reasonable efforts to cause such registration statement to become effective;

(vi) If the Initiating Holders propose to dispose of shares of Registrable Securities that may be registered on Form S-3 pursuant to a request made under Section 2.3;

(vii) If the Initiating Holders do not request that such offering be firmly underwritten by underwriters selected by the Initiating Holders (subject to the consent of the Company); or

(viii) If the Company and the Initiating Holders are unable to obtain the commitment of the underwriter described in clause (b)(vii) above to firmly underwrite the offer.

(c) **Deferral.** If (i) in the good faith judgment of the board of directors of the Company, the filing of a registration statement covering the Registrable Securities would be detrimental to the Company and the board of directors of the Company concludes, as a result, that it is in the best interests of the Company to defer the filing of such registration statement at such time, and (ii) the Company shall furnish to such Holders a certificate signed by the President of the Company stating that in the good faith judgment of the

-4-

board of directors of the Company, it would be detrimental to the Company for such registration statement to be filed in the near future and that it is, therefore, in the best interests of the Company to defer the filing of such registration statement, then (in addition to the limitations set forth in Section 2.1(b)(v) above) the Company shall have the right to defer such filing for a period of not more than ninety (90) days after receipt of the request of the Initiating Holders, and, provided further, that the Company shall not defer its obligation in this manner more than once in any twelve-month period.

(d) *Underwriting.* If the Initiating Holders intend to distribute the Registrable Securities covered by their request by means of an underwriting, they shall so advise the Company as a part of their request made pursuant to this Section 2.1 and the Company shall include such information in the written notice given pursuant to Section 2.1(a)(i). In any event, the right of any Holder to include all or any portion of its Registrable Securities in a registration pursuant to this Section 2.1 shall be conditioned upon such Holder's participation in an underwriting and the inclusion of such Holder's Registrable Securities to the extent provided herein. If the Company shall request inclusion in any registration pursuant to Section 2.1 of securities being sold for its own account, or if other persons shall request inclusion in any registration pursuant to Section 2.1, the Initiating Holders shall, on behalf of all Holders, offer to include such securities in the underwriting and such offer shall be conditioned upon the participation of the Company or such other persons in such underwriting and the inclusion of the Company's and such person's other securities of the Company and their acceptance of the further applicable provisions of this Section 2 (including Section 2.10). The Company shall (together with all Holders proposing to distribute their securities through such underwriting) enter into an underwriting agreement in customary form with the representative of the underwriter or underwriters selected for such underwriting by the Company which underwriters are reasonably acceptable to a majority-in-interest of the Initiating Holders.

Notwithstanding any other provision of this Section 2.1, if the underwriters advise the Initiating Holders in writing that marketing factors require a limitation on the number of shares to be underwritten, the number of Registrable Securities that may be so included shall be allocated as follows: (i) first, among all Holders requesting to include Registrable Securities in such registration statement based on the *pro rata* percentage of Registrable Securities held by such Holders, assuming conversion and (ii) second, to the Company, which the Company may allocate, at its discretion, for its own account, or for the account of other holders or employees of the Company.

If a person who has requested inclusion in such registration as provided above does not agree to the terms of any such underwriting, such person shall be excluded therefrom by written notice from the Company, the underwriter or the Initiating Holders. The securities so excluded shall also be withdrawn from registration. Any Registrable Securities or other securities excluded or withdrawn from such underwriting shall also be withdrawn from such registration. If shares are so withdrawn from the registration and if the number of shares to be included in such registration was previously reduced as a result of marketing factors pursuant to this Section 2.1(d), then the Company shall then offer to all Holders who have retained rights to include securities in the registration the right to include additional Registrable Securities in the registration in an aggregate amount equal to the number of shares so withdrawn, with such shares to be allocated among such Holders requesting additional inclusion, as set forth above.

## 2.2 Company Registration.

(a) *Company Registration.* If the Company shall determine to register any of its securities either for its own account or the account of a security holder or holders, other than a registration pursuant to Section 2.1 or 2.3, a registration relating solely to employee benefit plans, a registration relating to the offer and sale of debt securities, a registration relating to a corporate reorganization or other Rule 145 transaction, or a registration on any registration form that does not permit secondary sales, the Company will:

(i)     promptly give written notice of the proposed registration to all Holders; and

(ii)    use its commercially reasonable efforts to include in such registration (and any related qualification under blue sky laws or other compliance), except as set forth in Section 2.2(b) below, and in any underwriting involved therein, all of such Registrable Securities as are specified in a written request or requests made by any Holder or Holders received by the Company within ten (10) days after such written notice from the Company is mailed or delivered. Such written request may specify all or a part of a Holder's Registrable Securities.

(b)     *Underwriting.* If the registration of which the Company gives notice is for a registered public offering involving an underwriting, the Company shall so advise the Holders as a part of the written notice given pursuant to Section 2.2(a)(i). In such event, the right of any Holder to registration pursuant to this Section 2.2 shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein. All Holders proposing to distribute their securities through such underwriting shall (together with the Company and the other holders of securities of the Company with registration rights to participate therein distributing their securities through such underwriting) enter into an underwriting agreement in customary form with the representative of the underwriter or underwriters selected by the Company.

Notwithstanding any other provision of this Section 2.2, if the underwriters advise the Company in writing that marketing factors require a limitation on the number of shares to be underwritten, the underwriters may (subject to the limitations set forth below) limit the number of Registrable Securities to be included in the registration and underwriting; *provided, however*, that except in connection with the Company's initial underwritten public offering of Common Stock where Registrable Securities may be entirely excluded, the number of Registrable Securities shall not be limited to less than twenty-five percent (25%) of the aggregate number of shares proposed to be included in such underwriting. The Company shall so advise all holders of securities requesting registration, and the number of shares of securities that are entitled to be included in the registration and underwriting shall be allocated, as follows: (i) first, to the Company for securities being sold for its own account and (ii) second, to the Holders requesting to include Registrable Securities in such registration statement based on the *pro rata* percentage of Registrable Securities held by such Holders, assuming conversion.

If a person who has requested inclusion in such registration as provided above does not agree to the terms of any such underwriting, such person shall also be excluded therefrom by written notice from the Company or the underwriter. The Registrable Securities or other securities so excluded shall also be withdrawn from such registration. Any Registrable Securities or other securities excluded or withdrawn from such underwriting shall be withdrawn from such registration

(c)     *Right to Terminate Registration.* The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 2.2 prior to the effectiveness of such registration whether or not any Holder has elected to include securities in such registration.

## 2.3     Registration on Form S-3.

(a)     *Request for Form S-3 Registration.* After its initial public offering, the Company shall use its commercially reasonable efforts to qualify for registration on Form S-3 or any comparable or successor form or forms. After the Company has qualified for the use of Form S-3, in addition to the rights contained in the foregoing provisions of this Section 2 and subject to the conditions set forth in this Section 2.3, if the Company shall receive from a Holder or Holders of Registrable Securities a written request that the Company effect any registration on Form S-3 or any similar short form registration statement with

-6-

respect to all or part of the Registrable Securities (such request shall state the number of shares of Registrable Securities to be disposed of and the intended methods of disposition of such shares by such Holder or Holders), the Company will take all such action with respect to such Registrable Securities as required by Section 2.1(a)(i) and 2.1(a)(ii).

(b) *Limitations on Form S-3 Registration.* The Company shall not be obligated to effect, or take any action to effect, any such registration pursuant to this Section 2.3:

2.1(b)(v);

(i)     In the circumstances described in either Sections 2.1(b)(i), 2.1(b)(iii) or

(ii)     If the Holders, together with the holders of any other securities of the Company entitled to inclusion in such registration, propose to sell Registrable Securities and such other securities (if any) on Form S-3 at an aggregate price to the public of less than $1,000,000; or

(iii)     If, in a given twelve-month period, the Company has effected two (2) such registrations in such period.

(c)     *Deferral.* The provisions of Section 2.1(c) shall apply to any registration pursuant to this Section 2.3.

(d)     *Underwriting.* If the Holders of Registrable Securities requesting registration under this Section 2.3 intend to distribute the Registrable Securities covered by their request by means of an underwriting, the provisions of Section 2.1(d) shall apply to such registration. Notwithstanding anything contained herein to the contrary, registrations effected pursuant to this Section 2.3 shall not be counted as requests for registration or registrations effected pursuant to Section 2.1.

**2.4     Expenses of Registration.** All Registration Expenses incurred in connection with registrations pursuant to Sections 2.1, 2.2 and 2.3 shall be borne by the Company; *provided, however*, that the Company shall not be required to bear the fees of more than one counsel for all holders of Registrable Securities; and *provided, further*, that the Company shall not be required to pay for any expenses of any registration proceeding begun pursuant to Sections 2.1 and 2.3 if the registration request is subsequently withdrawn at the request of the Holders of a majority of the Registrable Securities to be registered or because a sufficient number of Holders shall have withdrawn so that the minimum offering conditions set forth in Sections 2.1 and 2.3 are no longer satisfied (in which case all participating Holders shall bear such expenses *pro rata* among each other based on the number of Registrable Securities requested to be so registered), unless the Holders of a majority of the Registrable Securities agree to forfeit their right to a demand registration pursuant to Section 2.1. All Selling Expenses relating to securities registered on behalf of the Holders shall be borne by the holders of securities included in such registration *pro rata* among each other on the basis of the number of Registrable Securities so registered.

**2.5     Registration Procedures.** In the case of each registration effected by the Company pursuant to Section 2, the Company will keep each Holder advised in writing as to the initiation of each registration and as to the completion thereof. At its expense, the Company will use its commercially reasonable efforts to:

(a)     Keep such registration effective for a period of ending on the earlier of the date which is sixty (60) days from the effective date of the registration statement or such time as the Holder or Holders have completed the distribution described in the registration statement relating thereto;

-7-

(b)     Prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement for the period set forth in subsection (a) above;

(c)     Furnish such number of prospectuses, including any preliminary prospectuses, and other documents incident thereto, including any amendment of or supplement to the prospectus, as a Holder from time to time may reasonably request;

(d)     Use its reasonable best efforts to register and qualify the securities covered by such registration statement under such other securities or Blue Sky laws of such jurisdiction as shall be reasonably requested by the Holders; *provided*, that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions;

(e)     Notify each seller of Registrable Securities covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading or incomplete in light of the circumstances then existing, and following such notification promptly prepare and furnish to such seller a reasonable number of copies of a supplement to or an amendment of such prospectus as may be necessary so that, as thereafter delivered to the purchasers of such shares, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading or incomplete in light of the circumstances then existing;

(f)     In connection with any underwritten offering pursuant to a registration statement filed pursuant to Section 2.1, enter into an underwriting agreement in form reasonably necessary to effect the offer and sale of Common Stock, provided such underwriting agreement contains reasonable and customary provisions, and provided further, that each Holder participating in such underwriting shall also enter into and perform its obligations under such an agreement.

## 2.6     Indemnification.

(a)     To the extent permitted by law, the Company will indemnify and hold harmless each Holder, each of its officers, directors and partners, legal counsel and accountants and each person controlling such Holder within the meaning of Section 15 of the Securities Act, with respect to which registration, qualification or compliance has been effected pursuant to this Section 2, and each underwriter, if any, and each person who controls within the meaning of Section 15 of the Securities Act any underwriter, against all expenses, claims, losses, damages and liabilities (or actions, proceedings or settlements in respect thereof) arising out of or based on: (i) any untrue statement (or alleged untrue statement) of a material fact contained or incorporated by reference in any registration statement, any prospectus included in the registration statement, any issuer free writing prospectus (as defined in Rule 433 of the Securities Act), any issuer information (as defined in Rule 433 of the Securities Act) filed or required to be filed pursuant to Rule 433(d) under the Securities Act or any other document incident to any such registration, qualification or compliance prepared by or on behalf of the Company or used or referred to by the Company, (ii) any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or (iii) any violation (or alleged violation) by the Company of the Securities Act, any state securities laws or any rule or regulation thereunder applicable to the Company and relating to action or inaction required of the Company in connection with any offering covered by such registration, qualification

or compliance, and the Company will reimburse each such Holder, each of its officers, directors, partners, legal counsel and accountants and each person controlling such Holder, each such underwriter and each person who controls any such underwriter, for any legal and any other expenses reasonably incurred in connection with investigating and defending or settling any such claim, loss, damage, liability or action; *provided* that the Company will not be liable in any such case to the extent that any such claim, loss, damage, liability, or action arises out of or is based on any untrue statement or omission based upon written information furnished to the Company by such Holder, any of such Holder's officers, directors, partners, legal counsel or accountants, any person controlling such Holder, such underwriter or any person who controls any such underwriter, and stated to be specifically for use therein; and *provided, further* that, the indemnity agreement contained in this Section 2.6(a) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld).

(b) To the extent permitted by law, each Holder will, if Registrable Securities held by such Holder are included in the securities as to which such registration, qualification or compliance is being effected, indemnify and hold harmless the Company, each of its directors, officers, partners, legal counsel and accountants and each underwriter, if any, of the Company's securities covered by such a registration statement, each person who controls the Company or such underwriter within the meaning of Section 15 of the Securities Act, each other such Holder, and each of their officers, directors and partners, and each person controlling each other such Holder, against all claims, losses, damages and liabilities (or actions in respect thereof) arising out of or based on: (i) any untrue statement (or alleged untrue statement) of a material fact contained or incorporated by reference in any prospectus, offering circular or other document (including any related registration statement, notification, or the like) incident to any such registration, qualification or compliance, or (ii) any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse the Company and such Holders, directors, officers, partners, legal counsel and accountants, persons, underwriters, or control persons for any legal or any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability or action, in each case to the extent, but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) is made in such registration statement, prospectus, offering circular or other document in reliance upon and in conformity with written information furnished to the Company by such Holder and stated to be specifically for use therein; *provided, however*, that the obligations of such Holder hereunder shall not apply to amounts paid in settlement of any such claims, losses, damages or liabilities (or actions in respect thereof) if such settlement is effected without the consent of such Holder (which consent shall not be unreasonably withheld); and *provided* that in no event shall any indemnity under this Section 2.6 exceed the gross proceeds from the offering received by such Holder, except in the case of fraud or willful misconduct by such Holder.

(c) Each party entitled to indemnification under this Section 2.6 (the *"Indemnified Party"*) shall give notice to the party required to provide indemnification (the *"Indemnifying Party"*) promptly after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought, and shall permit the Indemnifying Party to assume the defense of such claim or any litigation resulting therefrom; *provided* that the Indemnified Party may participate in such defense at the Indemnified Party's expense; and *provided further* that the failure of any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this Section 2.6, to the extent such failure is not prejudicial. No Indemnifying Party, in the defense of any such claim or litigation, shall, except with the consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release from all liability in respect to such claim or litigation. Each Indemnified Party shall furnish such information regarding itself or the claim in question as an Indemnifying Party may reasonably request in

writing and as shall be reasonably required in connection with defense of such claim and litigation resulting therefrom.

(d)     If the indemnification provided for in this Section 2.6 is held by a court of competent jurisdiction to be unavailable to an Indemnified Party with respect to any loss, liability, claim, damage, or expense referred to herein, then the Indemnifying Party, in lieu of indemnifying such Indemnified Party hereunder, shall contribute to the amount paid or payable by such Indemnified Party as a result of such loss, liability, claim, damage, or expense in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party on the one hand and of the Indemnified Party on the other in connection with the statements or omissions that resulted in such loss, liability, claim, damage, or expense as well as any other relevant equitable considerations. The relative fault of the Indemnifying Party and of the Indemnified Party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the Indemnifying Party or by the Indemnified Party and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission. No person or entity will be required under this Section 2.6(d) to contribute any amount in excess of the gross proceeds from the offering received by such person or entity, except in the case of fraud or willful misconduct by such person or entity. No person or entity guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) will be entitled to contribution from any person or entity who was not guilty of such fraudulent misrepresentation.

(e)     Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are in conflict with the foregoing provisions, the provisions in the underwriting agreement shall control.

**2.7     Information by Holder.** Each Holder of Registrable Securities shall furnish to the Company such information regarding such Holder and the distribution proposed by such Holder as the Company may reasonably request in writing and as shall be reasonably required in connection with any registration, qualification, or compliance referred to in this Section 2.

**2.8     Restrictions on Transfer.**

(a)     The holder of each certificate representing Registrable Securities by acceptance thereof agrees to comply in all respects with the provisions of this Section 2.8. Each Holder agrees not to make any sale, assignment, transfer, pledge or other disposition of all or any portion of the Restricted Securities, or any beneficial interest therein, unless and until the transferee thereof has agreed in writing for the benefit of the Company to take and hold such Restricted Securities subject to, and to be bound by, the terms and conditions set forth in this Agreement, including, without limitation, this Section 2.8 and Section 2.10, and:

(i)     There is then in effect a registration statement under the Securities Act covering such proposed disposition and the disposition is made in accordance with the registration statement; or

(ii)     The Holder shall have given prior written notice to the Company of the Holder's intention to make such disposition and shall have furnished the Company with a detailed description of the manner and circumstances of the proposed disposition, and, if requested by the Company, the Holder shall have furnished the Company, at the Holder's Company's expense, with (i) an opinion of counsel reasonably satisfactory to the Company to the effect that evidence reasonably satisfactory to the Company that such disposition will not require registration of such Restricted Securities under the Securities Act or

-10-

(ii) a "no action" letter from the Commission to the effect that the transfer of such securities without registration will not result in a recommendation by the staff of the Commission that action be taken with respect thereto, whereupon the holder of such Restricted Securities shall be entitled to transfer such Restricted Securities in accordance with the terms of the notice delivered by the Holder to the Company.

(b)     Notwithstanding the provisions of Section 2.8(a), no such registration statement, opinion of counsel or "no action" letter shall be necessary for (i) a transfer not involving a change in beneficial ownership, or (ii) transactions involving the distribution without consideration of Restricted Securities by any Holder to (x) a parent, subsidiary or other affiliate of the Holder, if the Holder is a corporation, (y) any of the Holder's partners, members or other equity owners, or retired partners, retired members or other equity owners, or to the estate of any of the Holder's partners, members or other equity owners or retired partners, retired members or other equity owners, or (z) a venture capital fund that is controlled by or under common control with one or more general partners or managing members of, or shares the same management company with, the Holder; *provided*, in each case, that the Holder shall give written notice to the Company of the Holder's intention to effect such disposition and shall have furnished the Company with a detailed description of the manner and circumstances of the proposed disposition.

(c)     Each certificate representing Registrable Securities shall (unless otherwise permitted by the provisions of this Agreement) be stamped or otherwise imprinted with a legend substantially similar to the following (in addition to any legend required under applicable state securities laws):

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, INCLUDING A LOCK-UP PERIOD IN THE EVENT OF A PUBLIC OFFERING, AS SET FORTH IN AN INVESTORS' RIGHTS AGREEMENT A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE COMPANY.

The Holders consent to the Company making a notation on its records and giving instructions to any transfer agent of the Restricted Securities in order to implement the restrictions on transfer established in this Section 2.8.

(d)     The first legend referring to federal and state securities laws identified in Section 2.8(c) stamped on a certificate evidencing the Restricted Securities and the stock transfer instructions and record notations with respect to the Restricted Securities shall be removed and the Company shall issue a certificate without such legend to the holder of Restricted Securities if (i) those securities are registered under the Securities Act, or (ii) the holder provides the Company with an opinion of counsel reasonably acceptable to the Company to the effect that a sale or transfer of those securities may be made without registration or qualification.

-11-

**2.9** **Rule 144 Reporting.** With a view to making available the benefits of certain rules and regulations of the Commission that may permit the sale of the Restricted Securities to the public without registration, the Company agrees to use its commercially reasonable efforts to:

(a) Make and keep adequate current public information with respect to the Company available in accordance with Rule 144 under the Securities Act, at all times from and after ninety (90) days following the effective date of the first registration under the Securities Act filed by the Company for an offering of its securities to the general public;

(b) File with the Commission in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act at any time after it has become subject to such reporting requirements; and

(c) So long as a Holder owns any Restricted Securities, furnish to the Holder forthwith upon written request a written statement by the Company as to its compliance with the reporting requirements of Rule 144 (at any time from and after ninety (90) days following the effective date of the first registration statement filed by the Company for an offering of its securities to the general public), and of the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), a copy of the most recent annual or quarterly report of the Company, and such other reports and documents so filed as a Holder may reasonably request in availing itself of any rule or regulation of the Commission allowing a Holder to sell any such securities without registration.

**2.10** **Market Stand-Off Agreement.** Each Holder shall not sell or otherwise transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, of any Common Stock (or other securities) of the Company held by such Holder (other than those included in the registration) during the one hundred eighty (180) day period following the effective date of the registration statement for the Company's Initial Public Offering filed under the Securities Act (or such other period as may be requested by the Company or an underwriter to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in NASD Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto). The obligations described in this Section 2.10 shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions and may stamp each such certificate with the second legend set forth in Section 2.8(c) with respect to the shares of Common Stock (or other securities) subject to the foregoing restriction until the end of such one hundred eighty (180) day (or other) period. Each Holder agrees to execute a market standoff agreement with said underwriters in customary form consistent with the provisions of this Section 2.10.

**2.11** **Delay of Registration.** No Holder shall have any right to take any action to restrain, enjoin, or otherwise delay any registration as the result of any controversy that might arise with respect to the interpretation or implementation of this Section 2.

**2.12** **Transfer or Assignment of Registration Rights.** The rights to cause the Company to register securities granted to a Holder by the Company under this Section 2 may be transferred or assigned by a Holder only to a transferee or assignee of not less than 100,000 shares, or all of such Holder's shares if such Holder holds in aggregate less than 100,000 shares, of Registrable Securities (as presently constituted and subject to subsequent adjustments for stock splits, stock dividends, reverse stock splits, and the like); *provided* that (i) such transfer or assignment of Registrable Securities is effected in accordance with the terms of

-12-

Section 2.8, and applicable securities laws, (ii) the Company is given written notice prior to said transfer or assignment, stating the name and address of the transferee or assignee and identifying the securities with respect to which such registration rights are intended to be transferred or assigned and (iii) the transferee or assignee of such rights assumes in writing the obligations of such Holder under this Agreement, including without limitation the obligations set forth in Section 2.10.

**2.13 Limitations on Subsequent Registration Rights.** From and after the date of this Agreement, the Company shall not, without the prior written consent of at least a majority of the Registrable Securities, enter into any agreement with any holder or prospective holder of any securities of the Company giving such holder or prospective holder any registration rights the terms of which are senior to the registration rights granted to the Holders hereunder; *provided, however*, that such restriction on the Company's ability to grant subsequent registration rights shall not prevent the Company from adding lending institutions, landlords, venture lenders, or other goods or services providers to this Agreement for the purpose of granting registration rights hereunder if such addition is approved by the Board of Directors of the Company.

**2.14 Termination of Registration Rights.** The right of any Holder to request registration or inclusion in any registration pursuant to Sections 2.1, 2.2 or 2.3 shall terminate on the earlier of (i) such date, on or after the closing of the Company's first registered public offering of Common Stock, on which all shares of Registrable Securities held or entitled to be held upon conversion by such Holder may immediately be sold under Rule 144 during any ninety (90) day period, and (ii) three (3) years after the closing of the Company's Initial Public Offering.

## SECTION 3

## COVENANTS OF THE COMPANY

The Company hereby covenants and agrees, as follows:

**3.1 Basic Financial Information Rights.** The Company will furnish the following reports to each Holder who owns at least 50,000 Shares and/or Conversion Stock (as presently constituted and subject to subsequent adjustments for stock splits, stock dividends, reverse stock splits, and the like):

(a) As soon as practicable after the end of each fiscal year of the Company, and in any event within ninety (90) days after the end of each fiscal year of the Company, an unaudited consolidated balance sheet of the Company and its subsidiaries, if any, as at the end of such fiscal year, and unaudited consolidated statements of income and cash flows of the Company and its subsidiaries, if any, for such year, prepared in accordance with U.S. generally accepted accounting principles consistently applied.

(b) As soon as practicable after the end of the first, second and third quarterly accounting periods in each fiscal year of the Company, and in any event within forty-five (45) days after the end of the first, second, and third quarterly accounting periods in each fiscal year of the Company, an unaudited consolidated balance sheet of the Company and its subsidiaries, if any, as of the end of each such quarterly period, and unaudited consolidated statements of income and cash flows of the Company and its subsidiaries, if any, for such period, prepared in accordance with U.S. generally accepted accounting principles consistently applied, subject to changes resulting from normal year-end audit adjustments.

(c) The Company's annual budget.

-13-

**3.2    Confidential Information and Invention Assignment Agreements.** Each employee, officer and consultant of the Company whose term of service begins after the date hereof shall enter into a Confidential Information and Invention Assignment Agreement or Consulting Agreement, as applicable, substantially in the forms approved by the Board.

**3.3    Employee Stock Plan.** The Company hereby agrees that, subject to the discretion of the Board, (i) all shares of Common Stock and options to purchase shares of Common Stock issued to officers, directors and employees of, or consultants to, the Company after the date of this Agreement pursuant to stock options, option plans, purchase plans or other employee stock incentive programs or arrangements will be subject to vesting as follows: 25% to vest at the end of the first year following such issuance, with the remaining 75% to vest monthly over the next three years and shall have no more beneficial acceleration provisions than standard double trigger acceleration; and (ii) the repurchase option governing stock sold subject to vesting as set forth above shall provide that upon termination of the services of the shareholder, with or without cause, the Company or its assignee (to the extent permissible under applicable securities law qualification) retains the option to repurchase at the lesser of cost or fair market value, any unvested shares held by such shareholder.

**3.4    Confidentiality.** Anything in this Agreement to the contrary notwithstanding, no Holder by reason of this Agreement shall have access to any trade secrets or classified information of the Company. The Company shall not be required to comply with any information rights of Section 3 in respect of any Holder whom the Company reasonably determines to be a competitor or an officer, employee, director or holder of more than ten percent (10%) of a competitor. Each Holder acknowledges that the information received by them pursuant to this Agreement may be confidential and for its use only, and it will not use such confidential information in violation of the Exchange Act or reproduce, disclose or disseminate such information to any other person (other than its employees or agents having a need to know the contents of such information, and its attorneys), except in connection with the exercise of rights under this Agreement, unless the Company has made such information available to the public generally.

**3.5    Termination of Covenants.** The covenants set forth in this Section 3 shall terminate and be of no further force and effect after the closing of the Company's Initial Public Offering.

## SECTION 4

## RIGHT OF FIRST OFFER

In the event that the Board determines that it would be in the best interests of the Company and its shareholders to raise capital by means of a Future Financing Event, as defined below, the Company shall give prompt written notice of such determination (the *"Future Financing Notice"*) to Semi-Materials Co. Ltd. (the *"ROFO Holder"*). For a period of thirty (30) days following its receipt of the Future Financing Notice, the Company and the ROFO Holder shall negotiate exclusively in good faith (the *"ROFO Negotiation Period"*) to reach mutually agreeable terms for such Future Financing Event. Each Holder agrees that if, during the ROFO Negotiation Period, the Company and the ROFO Holder enter into a definitive agreement to effect a Future Financing Event, such Holder shall be required to vote or cause to be voted all of its shares of the Company's capital stock in favor of such Future Financing Event on the terms and conditions agreed to between the Company and the ROFO Holder, and to take all such other actions in connection with the consummation of the Future Financing Event as are reasonably requested by the Company and the ROFO Holder. *"Future Financing Event"* means any transaction taking place after the date of this Agreement involving the sale by the Company of its equity securities or debt instruments convertible into securities exercisable for or convertible into its equity securities.

-14-

## SECTION 5

## COME-ALONG

In the event that the Board and the holders of at least a majority of the outstanding Common Stock and Series A Preferred Stock, voting together as a single class on an as-converted to Common Stock basis, vote to approve a Change of Control Transaction or a Future Financing Event, each Investor agrees (i) to vote all shares held by such Investor in favor of such Change of Control Transaction or Future Financing Event, as applicable, (ii) in the event of a Change of Control Transaction, to sell or exchange all shares of the Company's capital stock then held by such Investor pursuant to the terms and conditions of such Change of Control Transaction and to execute and deliver such other documents, and take such further actions, as are reasonably requested in connection with carrying out such Change of Control Transaction, and (iii) in the event of a Future Financing Event, to carry out such other actions (including consenting to or amending existing financing documents or executing documents reasonably related to such Future Financing Event) as are necessary to carry out such Future Financing Event.

For purposes of this Section 5, *"Change of Control Transaction"* means (i) the acquisition of the Company by another entity by means of any transaction or series of related transactions to which the Company is party (including, without limitation, any stock acquisition, reorganization, merger or consolidation but excluding any sale of stock for capital raising purposes) other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, as a result of shares in the Company held by such holders prior to such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity (or if the Company or such other surviving or resulting entity is a wholly-owned subsidiary immediately following such acquisition, its parent); (ii) a sale, lease or other disposition of all or substantially all of the assets of the Company and its subsidiaries taken as a whole including, without limitation by means of any transaction or series of related transactions, except where such sale, lease or other disposition is to a wholly-owned subsidiary of the Company; or (iii) any liquidation, dissolution or winding up of the Company, whether voluntary or involuntary. Notwithstanding the foregoing, the Investors obligations under this Section 5.1 with respect to a Change of Control Transaction are subject to the following conditions: (i) the consideration payable with respect to each share in each class or series as a result of such Change of Control Transaction is the same (except for cash payments in lieu of fractional shares) as for each other share in such class or series; and (ii) each class and series of capital stock of the Company will be entitled to receive the same form of consideration (and be subject to the same indemnity and escrow provisions) as a result of such Change of Control Transaction.

## SECTION 6

## MISCELLANEOUS

**6.1 Amendment.** Except as expressly provided herein, neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument referencing this Agreement and signed by the Company and the Holders holding a majority of the Registrable Securities (excluding any of such shares that have been sold to the public or pursuant to Rule 144); *provided, however,* that Holders purchasing shares of Series A Preferred Stock in a Closing after the Initial Closing (each as defined in the Purchase Agreement) may become parties to this Agreement by executing a counterpart of this Agreement without any amendment of this Agreement pursuant to this paragraph or any consent or approval of any other Holder; *provided, further,* that, except as set forth in Section 2.13, the Company may add banks, equipment or real estate lessors, venture lenders, or other financial institutions to this Agreement for the

-15-

purpose of granting registration rights hereunder without any amendment of this Agreement pursuant to this paragraph or any consent or approval of any Holder. Any such amendment, waiver, discharge or termination effected in accordance with this paragraph shall be binding upon each Holder and each future holder of all such securities of Holder. Each Holder acknowledges that by the operation of this paragraph, the holders of a majority of the Registrable Securities (excluding any of such shares that have been sold to the public or pursuant to Rule 144) will have the right and power to diminish or eliminate all rights of such Holder under this Agreement.

**6.2    Notices.** All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, sent by facsimile or electronic mail (if to an Investor or Holder) or otherwise delivered by hand, messenger or courier service addressed:

(a)    if to an Investor, to the Investor's address, facsimile number or electronic mail address as shown in the Company's records, as may be updated in accordance with the provisions hereof;

(b)    if to any Holder, to such address, facsimile number or electronic mail address as shown in the Company's records, or, until any such Holder so furnishes an address, facsimile number or electronic mail address to the Company, then to the address of the last holder of such shares for which the Company has contact information in its records; or

(c)    if to the Company, to the attention of the Chief Executive Officer or Chief Financial Officer of the Company at SunPods, Inc., 1922 The Alameda, Suite 214, San Jose, CA 95126, or at such other current address as the Company shall have furnished to the Investors or Holders, with a copy (which shall not constitute notice) to Gavin McCraley, Esq., Wilson Sonsini Goodrich & Rosati, P.C., 650 Page Mill Road, Palo Alto, California 94304.

Each such notice or other communication shall for all purposes of this Agreement be treated as effective or having been given (i) if delivered by hand, messenger or courier service, when delivered (or if sent via a nationally-recognized overnight courier service, freight prepaid, specifying next-business-day delivery, one business day after deposit with the courier), or (ii) if sent via mail, at the earlier of its receipt or five days after the same has been deposited in a regularly-maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid, or (iii) if sent via facsimile, upon confirmation of facsimile transfer or, if sent via electronic mail, upon confirmation of delivery when directed to the relevant electronic mail address, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day.

**6.3    Governing Law.** This Agreement shall be governed in all respects by the internal laws of the State of California as applied to agreements entered into among California residents to be performed entirely within California, without regard to principles of conflicts of law.

**6.4    Successors and Assigns.** This Agreement, and any and all rights, duties and obligations hereunder, shall not be assigned, transferred, delegated or sublicensed by any Investor without the prior written consent of the Company. Any attempt by an Investor without such permission to assign, transfer, delegate or sublicense any rights, duties or obligations that arise under this Agreement shall be void. Subject to the foregoing and except as otherwise provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.

**6.5    Entire Agreement.** This Agreement and the exhibits hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof. No party hereto shall be

-16-

liable or bound to any other party in any manner with regard to the subjects hereof or thereof by any warranties, representations or covenants except as specifically set forth herein.

**6.6 Delays or Omissions.** Except as expressly provided herein, no delay or omission to exercise any right, power or remedy accruing to any party to this Agreement upon any breach or default of any other party under this Agreement shall impair any such right, power or remedy of such non-defaulting party, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party to this Agreement, shall be cumulative and not alternative.

**6.7 Severability.** If any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Agreement, and such court will replace such illegal, void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the same economic, business and other purposes of the illegal, void or unenforceable provision. The balance of this Agreement shall be enforceable in accordance with its terms.

**6.8 Titles and Subtitles.** The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. All references in this Agreement to sections, paragraphs and exhibits shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits attached hereto.

**6.9 Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be enforceable against the parties that execute such counterparts, and all of which together shall constitute one instrument.

**6.10 Telecopy Execution and Delivery.** A facsimile, telecopy or other reproduction of this Agreement may be executed by one or more parties hereto and delivered by such party by facsimile or any similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen. Such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any party hereto, all parties hereto agree to execute and deliver an original of this Agreement as well as any facsimile, telecopy or other reproduction hereof.

**6.11 Jurisdiction; Venue.** With respect to any disputes arising out of or related to this Agreement, the parties consent to the exclusive jurisdiction of, and venue in, the state courts in Santa Clara County in the State of California (or in the event of exclusive federal jurisdiction, the courts of the Northern District of California).

**6.12 Further Assurances.** Each party hereto agrees to execute and deliver, by the proper exercise of its corporate, limited liability company, partnership or other powers, all such other and additional instruments and documents and do all such other acts and things as may be necessary to more fully effectuate this Agreement.

-17-

**6.13     Termination Upon Change of Control.** Notwithstanding anything to the contrary herein, this Agreement (excluding any then-existing obligations) shall terminate upon a Change of Control Transaction, as defined above.

**6.14     Conflict.** In the event of any conflict between the terms of this Agreement and the Company's articles of incorporation or its bylaws, the terms of the Company's articles of incorporation or its bylaws, as the case may be, will control.

**6.15     Attorneys' Fees.** In the event that any suit or action is instituted to enforce any provision in this Agreement, the prevailing party in such dispute shall be entitled to recover from the losing party such reasonable fees and expenses of attorneys and accountants, which shall include, without limitation, all fees, costs and expenses of appeals.

**6.16     Aggregation of Stock.** All securities held or acquired by affiliated entities (including affiliated venture capital funds) or persons shall be aggregated together for purposes of determining the availability of any rights under this Agreement.

6.17     **Jury Trial. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING (WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATED TO THIS AGREEMENT.** If the waiver of jury trial set forth in this section is not enforceable, then any claim or cause of action arising out of or relating to this Agreement shall be settled by judicial reference pursuant to California Code of Civil Procedure Section 638 *et seq.* before a referee sitting without a jury, such referee to be mutually acceptable to the parties or, if no agreement is reached, by a referee appointed by the Presiding Judge of the California Superior Court for Santa Clara County. This paragraph shall not restrict a party from exercising remedies under the Uniform Commercial Code or from exercising pre-judgment remedies under applicable law.

*(signature page follows)*

-18-

The parties are signing this Investors' Rights Agreement as of the date stated in the introductory clause.

**INVESTOR**

**SEMI-MATERIALS CO., LTD.**

_(Print investor name)_

_(Signature)_

_(Print name of signatory, if signing for an entity)_

_(Print title of signatory, if signing for an entity)_

_**(Signature page to the Investors' Rights Agreement)**_

**Exhibit D**

**COMPLIANCE CERTIFICATE**

March [15], 2010

Pursuant to Section 5.6 of the Series B Preferred Stock Purchase Agreement, dated as of March [15], 2010 between SunPods, Inc., a California corporation (the "*Company*"), and Semi-Materials Co., Ltd. (the "*Agreement*"), the undersigned certifies on behalf of the Company as follows:

1. The undersigned is the President of the Company.

2. Except as set forth in or modified by the Schedule of Exceptions, the representations and warranties of the Company in Section 3 of the Agreement are true and correct in all material respects as of the date hereof.

3. The Company has performed or complied with all covenants, agreements and conditions contained in the Agreement to be performed or complied with by the Company on or prior to the Closing in all material respects.

Capitalized terms used but not defined herein have the meanings ascribed to them in the Agreement.

The undersigned signs this certificate as of the date indicated under the title.

SunPods, Inc.
a California corporation

By: _____

Name: DAN S. JACOBER

Title: President

**Exhibit E**

## SECRETARY'S CERTIFICATE

March 15, 2010

Pursuant to Section 5.6 of the Series B Preferred Stock Purchase Agreement (the "*Agreement*"), dated as of March 15, 2010 between SunPods, Inc., a California corporation (the "*Company*"), and Semi-Materials Co., Ltd., the undersigned certifies as follows:

1.      The undersigned is the Secretary of the Company.

2.      Attached as **Exhibit A** is a true and complete copy of the resolutions duly adopted by the board of directors of the Company authorizing the transactions contemplated by the Agreement. The resolutions (i) were adopted in compliance with the Company's articles of incorporation and bylaws, (ii) have not been amended, modified or rescinded since their adoption and (iii) are in full force and effect as of the date hereof.

3.      Attached as **Exhibit B** is a true and complete copy of the resolutions duly adopted by the shareholders of the Company relating to the transactions contemplated by the Agreement. The resolutions (i) were adopted in compliance with the Company's articles of incorporation and bylaws, (ii) have not been amended, modified or rescinded since their adoption and (iii) are in full force and effect as of the date hereof.

4.      Attached as **Exhibit C** is a true and complete copy of the amended and restated articles of incorporation of the Company as in effect on the date hereof (the "*Restated Articles*"). No steps have been taken by the board of directors or shareholders of the Company to authorize or effect any amendment or other modification to the Restated Articles, other than as may be contemplated by the Agreements.

5.      Attached as **Exhibit D** is a true and complete copy of the bylaws of the Company as in effect on the date hereof (the "*Bylaws*"). No steps have been taken by the board of directors or shareholders of the Company to authorize or effect any amendment or other modification to the Bylaws, other than as may be contemplated by the Agreements.

6.      Each person who, as an officer of the Company, signed the Agreement or any other document delivered in connection with the Agreement, was duly elected or appointed, qualified and acting as an officer of the Company at the respective times of the signing and delivery thereof and was duly authorized to sign each such document on behalf of the Company. The signature of each such person appearing on each such document is the genuine signature of each such person or a true facsimile thereof.

All capitalized terms used but not defined herein have the meanings ascribed to them in the Agreement.

*(signature page follows)*

The undersigned signs this certificate as of the date indicated under the title.

By: _____
Michael Gumm
Secretary

The undersigned certifies, on behalf of the Company, as of the date hereof, that (i) Michael Gumm is the duly elected or appointed, qualified and acting Secretary of the Company, and (ii) the signature appearing above is Michael Gumm's genuine signature or a true facsimile thereof.

**SUNPODS, INC.**

By: _____
Dan Jaeger
President

*(Signature page to the Secretary's Certificate)*

-2-